First Nat'l Bank of Albuquerque v. Stover, 21 N. M. 453.

[No. 1722, March 30, 1915.]

[On Rehearing, January 11, 1916.]

[On Second Motion for Rehearing, March 4, 1916.]

# FIRST NATIONAL BANK OF ALBUQUERQUE v. STOVER.

## SYLLABUS BY THE COURT.

1. A promissory note, containing the provision that "all parties hereto, * * * agree that this note may be extended from time to time by any one or more of us without the knowledge or consent of any of the others of us, and after such extension, the liability of all parties shall remain as if no such extension had been made," grants no power to the maker or other parties to the note to extend the time of payment without the consent of the payee or holder.

P. 458

2. A provision in a note in the foregoing form does not render the note non-negotiable under the law merchant or the provisions of the negotiable instruments law (Law 1907, c. 83.)

P. 464

3. The general principles, running throughout the whole law, that notice of facts which should put one upon inquiry and which, if followed up with diligence and understanding, would lead to the truth, has no application to the question of good faith in the taking of negotiable instruments. The question in such cases is, Did the holder have actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith? Suspicious circumstances, negligence, or willful ignorance may be evidence of bad faith from which the jury may find the fact. The holder, however, will be protected unless, at the time he took the paper, he had reason to believe, and did believe, there was some defect or infirmity in the paper. The facts in this case examined and held not to authorize a finding that the appellant bank did not take the note in good faith; three being no substantial evidence to support any such finding.

P. 471

4. Sections 646, 649, 653, Code 1915, applied, and held that the plaintiff bank, under the circumstances, took the note in question charged with the burden of proof that it took the same in due course. Held, further, that under the proof, that burden had been successfully met. Held, further, that where the evidence was all one way, and the witness stands unimpeached in any way, his evidence is to be taken by this court as true in determining whether there is any substantial evidence to support the verdict.

P. 481

Appeal from District Court, Bernalillo County; Mechem, Judge.

Action by the First National Bank of Albuquerque against Roderick Stover. From a judgment for defendant, plaintiff appeals. Reversed and remanded, with directions.

A. B. McMillen of Albuquerque, for appellant.

Plaintiff was a holder in due course.

Secs. 52, 56, L. 1907, pp. 172-3; Arndt v. Aylesworth, 123 N. W. 1000.

Suspicious circumstances alone not sufficient to prevent recovery.

Valley Savings Bank v. Mercer, 97 Md. 458, 55 Atl. 435; Hutchins v. Langley, 27 App. D. C. 234; Ketchem v. Govin, 35 Misc. R. 375, 71 N. Y. Supp. 991; Matlock v. Scheurman, 51 Or. 49, 93 Pac. 823, 17 L. R. A. (N. S.) 747; Aldrich v. Peckham, 74 N. J. Law, 711, 68 Atl. 345; Kipp v. Smith, 137 Wis. 234, 118 N. W. 848; Rice v. Barrington, 79 N. J. Law, 806, 70 Atl. 149; Jefferson Bank v. Chapman-White Lyons Co. (Tenn.) 123 S. W. 641; Dorsey v. Wellman (Neb.) 122 N. W. 989.

The note in controversy is a negotiable instrument.

First Nat'l Bank of Albuquerque v. Stover, 21 N. M. 453.

P. 165, L. 1907; U. S. F. & G. Co. v. Board of Commissioners, 145 Fed. 148; Capron v. Capron, 44 Vt. 412; Protection Ins. Co. v. Bill, 31 Conn. 534; Jacobs v. Gibson, 77 Mo. App. 246; Anniston L. & T. Co. v. Stockney, 19 So. 65; Nat'l Bk. Commerce v. Kinney, 83 S. W. 371; Farmer, etc., v. Graettinger, 107 N. W. 172; Bank v. Buttery, 116 N. W. 341; Stitzel v. Miller, 250 Ill. 72, 95 N. E. 53; Mo. Lincoln T. Co. v. Long, 120 Pac. 292; Navajo County Bank v. Dolson, 126 Pac. 156; Bank v. Loukonen, 127 Pac. 948; De Groat v. Focht, 131 Pac. 173.

E. W. DOBSON and MARRON & WOOD, all of Albuquerque, for appellee.

Joint request for directed verdict, in form in which it was made, made court trier of fact, and every issue fact must be deemed answered in favor of defendant.

Bank v. Woodfuff, 14 N. W. 502; Bank of Commerce v. Broyles, 16 N. M. 414; Beutell v. Magone, 157 U. S. 154; Kurtz v. Peck, 113 N. Y. 222; Stanford v. McGill, 6 N. Dak. 536; Bankers' Co. v. State Bank, 150 Fed. 78; City of Defiance v. McGonigal, 150 Fed. 689; Ins. Co. v. Ry. Co., 134 Fed. 794; Ins. Co. v. Kerr, 129 Fed. 723; Dailey v. Foster, 17 N. M. 654.

Evidence warranted finding plaintiff was not holder in due course. Reply admits it.

Secs. 55, 56, Neg. Inst. Act, 1907; Link v. Jackson, 139 S. W. 588; Daniels Neg. Inst. (6th ed.), sec. 776; Ward v. City Trust Co., 192 N. Y. 61; McKnight v. Parsons, 136 Ia. 390; In re Hopper Morgan Co., 156 Fed. 525.

Effect of failure to produce important witness.

Wigmore on Ev., sec. 285; 16 Cyc. 1062; C. N. Bank v. Diefendorf, 123 N. Y. 191; Kavanagh v. Wilson, 70 N. Y. 177; Honnegger v. Wettstein, 94 N. Y. 252; 40 Cyc. 2593; Id. 2653.

The note is not a negotiable instrument.

Citizens Bank v. Piollett, 4 L. R. A. 190; Woodbury v. Roberts, 44 Am. R. 685; Smith v. Van Blarcom, 45 Mich. 471; Gliddon v. Henry, 54 Am. R. 316; City National Bank v. Gunter Bros., 72 Pac. 842; Union Bank v. Boland, 93 Pac. 508; Coffin v. Spencer, 39 Fed. 262.

As to construction of instrument, see:

Chitty on Bills of Exchange, 15; Hensley v. Tuttle, 46 N. E. 594; Page on Contracts, sec. 12; Gillett v. Bank of America, 160 N. Y. 549; 9 Cyc. 590; Page on Contracts, 1154, 1155; sec. 1, sub-sec. 3, Neg. Inst. Act.

## OPINION OF THE COURT.

PARKER, J.—A promissory note was made and delivered in the following form:

"6250.00.    Albuquerque, N. M., Jan. 5, 1911.
"On or before two years after date I promise to pay to the order of W. H. Gillenwater at Montezuma Trust Company six thousand two hundred fifty and no 100 dollars, with interest at the rate of six per cent. per annum from April 1, 1912, until paid, payable semiannually, with ten per cent. additional on the amount unpaid as attorney's fees, if placed for collection in the hands of an attorney. All parties hereto and all indorsers hereof waive grace and protest and all appraisement laws and agree that this note may be extended from time to time by any one or more of us without the knowledge or consent of any of the others of us, and after such extension, the liability of all parties shall remain as if no such extension had been made.
"Payable at the Montezuma Trust Company, Albuquerque, N. M.
                    "[Signed]    Roderick Stover."

Action was brought on the note by the plaintiff as indorsee; claiming to be a bona fide holder for value without notice and prior to maturity. The answer admitted the execution and delivery of the note, but alleged, by way of defense, that the note was given in payment for shares of stock in a bank of which the payee of the note was the head, under a proposed scheme for its reorganization and the increase of capital stock; that it was agreed between the parties that proceeds arising from the sale of said stock should be deposited with and held as a special

First Nat'l Bank of Albuquerque v. Stover, 21 N. M. 453.

deposit by the Montezuma Trust Company until the re-. organization should be completed; that if the defendant would purchase 50 shares of the new capital stock for the sum of $6,250, his note would be accepted therefor, payable at such time as he desired, and that if for any reason it was not convenient for him to pay the note when it became due, he might extend the same from time to time until such further time as he desired; that said note would not be used, delivered, put into effect, or considered valid or in force until the entire $200,000 of capital stock should be fully subscribed; that said note was accordingly given in payment for a subscription for 50 shares of the stock in the said corporation contemplated to be organized; that the said corporation was never organized or created, nor were any other subscriptions to the stock thereof ever secured or paid for; that thereafter, in violation of this promise and agreement with the defendant, the payee of the note fraudulently and without authority indorsed the said note to the plaintiff in this case for the sole personal use and credit of the said payee; that the plaintiff had full knowledge and notice of all of the facts hereinbefore stated, and took the said note charged and chargeable with full knowledge and notice thereof and of each of said facts. The plaintiff replied, denying that it took the said promissory note with knowledge of the facts and alleged that the same was delivered to the plaintiff for full value in due course of business. At the close of the trial each party moved for a directed verdict in his favor, and the court thereupon directed a verdict for the defendant. The only testimony given in the case was that of the vice-president and manager of the plaintiff bank, designed to show that the bank took the note as collateral security for a present loan made to payee of the note at the time, and in good faith without any notice of the facts alleged in the answer by way of defense. The motion of the defendant for a directed verdict was upon the ground that the note was without consideration, and that the note itself by its terms is not a negotiable promissory note, and that the plaintiff, there-.

fore, took it chargeable with all the defenses and equities which would have been good as between the original parties. The grounds of the motion in behalf of the plaintiff for a directed verdict in its favor are not stated. A verdict was rendered by the jury, in accordance with the instruction of the court, in favor of the defendant. The motion for a new trial was filed and overruled, and the plaintiff appeals.

It is apparent that the question involved is a very narrow one. The position of the defendant is clearly shown by his motion for a verdict in his favor. It is based upon the proposition that the note was without consideration, or rather that the consideration therefor failed, which facts are admitted by the pleadings. Upon the state of the pleadings it is clear that the original payee had no cause of action upon the note against the defendant. The defendant further urged upon the trial court that the form of the note is such that it is a non-negotiable instrument. Therefore, it is argued, that it was impossible for the plaintiff to become the holder in due course so as to cut off the defenses which would be available as between the original parties to the note. The argument is made by counsel for appellee that the note is non-negotiable for two reasons, viz.: (1) It contains a provision that the maker shall have the right to extend the maturity of the note from time to time at his pleasure, thus rendering the time of payment indefinite and uncertain; (2) even if the power to extend the time of payment is conferred by the terms of the note, upon the payee or holder alone, yet this renders the time of payment indefinite and uncertain and destroys the negotiability of the note. On the other hand, counsel for appellant argues that no such power is conferred upon the maker, and he denies appellee's second proposition entirely.

[1] The language employed in the note is certainly unfortunate. It provides that:

"All parties hereby * * * agree that this note may be extended from time to time by any one or more of us without the knowledge or consent of any of the others of us."

The maker of the note is certainly one of the "parties." The maker certainly has the power to extend the time of payment of the note by the express terms of the contract, in so far as the terms used give that power. But is the grant of power to the maker to extend the time of payment an absolute grant of that power regardless of the consent of the holder? It would seem that the answer is determinable by a proper definition of the words "may be extended." It is a matter of common knowledge and practice that an extension of the time of payment of a note is accomplished by the concurrence of the payee or holder, and some one or more of the other parties to the contract. The actual extension of the time is effectuated by the agreement of the payee or holder. The maker or indorsers cannot extend the time unless the payee consents. If it is intended to give to the maker absolutely the right to extend, a provision is sometimes inserted that he may have the right to an extension for a certain specific time, or according to whatever the contract may be between the parties. The provision then in this contract that "this note may be extended from time to time by any one or more of us without the knowledge or consent of any of the others of us," in the light of commercial custom and usages, as well as common knowledge, is the equivalent of saying that "this note may be extended, with the consent of the payee or holder, from time to time," etc., because it is a contradiction in terms to say that a note may be extended without the consent of the payee or holder, unless the contract provides in terms that the maker shall have the right to an extension. The words "without the knowledge or consent of any of the others of us" can clearly have no application to the payee or holder. As before seen, there can be no such thing as an extension without his consent. The extension is effectuated by the making of a new contract between the parties, except in those cases where the right is given in terms to the maker, and a granting of the extension is, in such case, but the performance of a contract already made. That this is the sense in which the word "extended" was

used by the parties is made more manifest by the following clause:

"And after such extension liability of all parties shall remain as if no extension had been made."

There could be no liability on the part of the payee or holder, and the words used clearly indicate that the object of all of the provisions in regard to extensions were inserted simply to avoid the consequences, under the law merchant, of an extension without the consent of the indorsers or sureties. They do not grant the arbitrary right to the maker or other parties to the note to extend the same at their will and against the consent of the payee or holder; they simply provide that, in case of extension, they agree that their liability shall remain unchanged. It follows that the payee or holder of this note may insist upon payment of the same when due, and that there is consequently no uncertainty as to the time of payment, by reason of any right conferred upon the maker.

We are aware that this interpretation does violence to the naked letter of the contract. It provides that the note may be extended by "any one" of the parties without the "knowledge or consent" of any of the others. Then the maker may mentally resolve to extend the note indefinitely, and, without the knowledge or consent of the payee, may effectuate an indefinite extension, thereby rendering the contract an empty shell, devoid of meaning or efficiency. If such were the sense in which the word "extended" was used by the maker and payee in this case, they must be convicted of a foolish and vain act, if not an intention to carefully prepare a trap for the unwary. But no such presumption can be indulged. They are to be presumed to have intended to put out an ordinary note, expressing the ordinary binding contract of this kind.

Not much, if any, direct precedent is to be found in the cases, because no such language, probably, was ever before used in a note. Some of the cases, however, are valuable for their statements of the principles governing these matters.

In First National Bank v. Buttery, 17 N. D. 326, 116 N. W. 341, 16 L. R. A. (N. S.) 878, 17 Ann. Cas. 52, the note in question contained the provision that:

"The makers and indorsers herein severally  *  *  *  consent that the time of payment may be extended without notice."

It was argued that under this provision the holder of the note might, without notice, extend the note indefinitely, thereby rendering the time of payment uncertain and the note consequently non-negotiable. The court said:

"It is strenuously argued that the use of the word 'makers' in the waiver admits of an extension being made at any time on the part of the holder, by a mere secret mental process unknown to any other party. This may be true as a psychological fact, but we do not deem it so as a matter of practice in commerce and banking. To us it is quite clear that it has the same effect as though the note read 'on the 1st day of October, 1903, or thereafter on demand.' in which case there would be no question of its negotiability. Holders of notes do not, by a secret mental process, make an extension of the time of payment, but such extension, if made at all, is made by an agreement between the principal debtor and the holder of the paper, either with or without the consent of the indorsers."

In National Bank v. Kenney, 98 Tex. 293. 83 S. W. 368, the note in question contained the provisions that:

"The makers and indorsers hereof hereby severally  *  *  * agree to all extensions and partial payments before or after maturity without prejudice to holder."

The Texas court said:

"If, as argued, the effect of the stipulation is to give the right to the maker, without the consent of the holder, or to the holder without the consent of the maker, to appoint another date of payment and thereby extend the time it may be that it would render the instrument not negotiable. But we do not think it capable of that construction. It does not say that either the holder or the maker may extend the note. It merely makes a provision in case the time of payment may be extended. How extended? It seems to us that the extension meant is that which takes place when the debtor and creditor make an agreement upon a valuable consideration for the payment of the debt on some day subsequent to that previously stipulated. The obvious purpose of the provision

taken as a whole was merely to relieve the holder of the paper from the burdens made necessary by the rigid requirements of the mercantile law in order to secure the continued liability of the indorsers and sureties upon the paper. Therefore what was meant by the stipulation as to extension of time was simply that in case the holder and the maker should agree upon an extension, the sureties and indorsers should not be discharged. The holder and maker of any note may, at any time, agree upon an extension; therefore the fact that they may have that right does not affect the negotiability of the paper. * * * So in that case, the time at which the maker may elect to pay is uncertain, but the time at which the holder may demand payment is certain. It follows that if the holder has the absolute right to demand payment at a certain date, the note is negotiable."

In Longmont National Bank v. Loukonen, 53 Colo. 489, 127 Pac. 947, Ann. Cas. 1914B, 208, the note in question contained a provision that:

"The makers and indorsers hereof hereby * * * agree to any extensions of time of payment and partial payments before, at or after maturity."

The court said:

"The provision under consideration does not mean that the holder can arbitrarily extend the time of the payment of the note as he may see fit, over objection by the maker, nor can the latter make an extension without the consent of the holder."

In Bank v. Dolsom, 163 Cal. 485, 126 Pac. 153, 41 L. R. A. (N. S.) 787, the note in question provided that:

"We agree that after maturity this note may be extended from time to time by any one or more of us without the knowledge or consent of any of the others of us, and after such extension the liability of all parties shall remain as if no such extension had been made."

The court, in speaking of this provision, says:

"There is nothing uncertain in this note about the date of maturity. The provision refers only to something that may be done by the maker, if the holder agrees thereto, 'after maturity.' Clearly the provision referred to is in no way binding upon the holder of the note. No one can reasonably claim that the effect thereof is to give the maker the right to extend the time of payment, without the consent of the holder. The note was dated April 23, 1908, and by its terms,

First Nat'l Bank of Albuquerque v. Stover, 21 N. M. 453.

unaffected by anything in the provision referred to, was to mature 'nine months after date,' at which time the holder, so far as anything contained therein is concerned, had the absolute right to insist on payment. There was no provision under which the time so specified could be changed, or the right of the holder to insist on payment at such time be held to be affected. Where the time is thus definitely and irrevocably fixed at which the note shall mature and the holder shall be at liberty to compel payment, we are unable to see how a provision, looking to a possible agreement between the parties, after maturity, for an extension, renders the executed note at all indefinite or uncertain as to the time when it is payable."

The interpretation of the language which is identical with the note here in question, in this regard, is exactly as we have interpreted this one. The fact of. the slight difference in the phraseology in the other regard in no way affects the reasoning in the California case.

In Missouri-Lincoln Trust Co. v. Long, 31 Okl. 1, 120 Pac. 291, the note contained the provision that:

"The makers * * * consent that the time for payment may be extended without notice thereof."

The court holds that the provision does not make a note non-negotiable, relying upon First National Bank v. Buttery, 17 N. D. 326, 116 N. W. 341, 16 L. R. A. (N. S.) 878, 17 Ann. Cas. 52, supra, and other cases for authority.

In Stitzel v. Miller, 250 Ill. 72, 95 N. E. 53, 34 L. R. A. (N. S.) 1004, Ann. Cas. 1912B, 412, the note contained the provision .that:

"We also agree that in case said note is not paid at maturity, it is at the option of the holder hereof to extend, as he deems proper, the payment of the above note, and that said extension shall not in any manner release one or either of us. from the payment hereof."

The court says:

"The contention that said quoted words gave the holder the authority to extend the note as he pleased, that it could not be known what extensions he might grant, and that therefore the time when the note became due * * * was uncertain and undeterminate, rendering the note nonnegotiable, cannot be sustained. The note expressly provides that such option to extend can be exercised only upon the failure of the payors to make payment at its maturity."

The decision is based upon the proposition that until the note matures no person under its terms had power to make an extension of time for payment, and contains an expression to the effect that, if there was authority to extend the note before maturity, it would render the note non-negotiable.

[2] A much more serious question arises under appellee's second proposition. It is apparent that if a provision is inserted for extensions at or after maturity, they can have no effect upon the negotiability of the note, because at maturity the note ceases to be negotiable by operation of law. It therefore becomes immaterial that a provision is inserted that, after the maturity of the note, the sureties and indorsers shall not be discharged in case the note is extended. This is clearly pointed out in the Illinois and California cases, cited supra.

But where there is a provision authorizing extensions prior to maturity, then a more serious proposition is presented. If the note may be extended from time to time at will during the period prior to maturity, then the time of payment becomes uncertain and indefinite. It is upon this proposition that, in a majority of the states, we believe, a note like the one here in question is held to be non-negotiable. Thus in Smith v. Van Blarcom, 45 Mich. 371, 8 N. W. 90, the note contained a provision that:

"The makers and indorsers of this note expressly agree that the payee, or his assigns, may extend the time of payment thereof indefinitely, as he or they may see fit."

The court, per Campbell, J., said:

"By the terms of this note, which must be read subject to the condition, it was not payable absolutely three months after date, or at any other one time. The time of payment could be postponed not merely once, but as often as either Charles H. Van Blarcom or his assigns might think it desirable. There is nothing on the face of the note whereby any one can tell, either directly or by reference to any particular event, at what period this paper will become absolutely payable. We cannot conceive how this can be treated as not payable on a contingency."

In Richmond National Bank v. Wheeler, 75 Mich. 546, 42 N. W. 963, a note containing a similar provision was likewise held to be non-negotiable. In Woodbury v. Roberts, 59 Iowa, 348, 13 N. W. 312, 44 Am. Rep. 685, the note contained a provision that:

"The makers and indorsers of this obligation further expressly agree that the payee, or his assigns, may extend the time of payment thereof from time to time indefinitely, as he or they may see fit."

The court said:

"But the note before us may never fall due, for payment may be extended indefinitely. * * * By regarding such paper as nonnegotiable no prejudice will result to the mercantile and financial business of the country, but sharpers will be defeated in their attempt to swindle the confiding and unwary, a result in accord with sound policy and good morals."

In Farmer v. Bank, 130 Iowa, 469, 107 N. W. 107, the note contained the provision that:

"Sureties hereby consent that time of payment may be extended from time to time without notice thereof."

The distinction drawn in this case is evidently based upon the fact that in the former there was an agreement to an extension, but in the latter there was merely an agreement that the surety should not be discharged in case an extension should be granted. In Glidden v. Henry, 104 Ind. 278, 1 N. E. 369, 54 Am. Rep. 316, the provision for extensions are the same as in the Michigan case, supra, and the court said:

"In the case before us, all parts of the note must be looked to in determining the quality of the paper. There is a promise to pay in 12 months, but that promise is not certain and unconditional. The other clause is that the time of payment may be extended indefinitely, as the parties may agree. From an inspection of the note, it is impossible to tell when it may mature, because it is impossible to know what extension may have been, or may hereafter, be agreed upon."

In Coffin v. Spencer (C. C.) 39 Fed. 262, the provision in the note was practically the same as in the Michigan

and Indiana cases, and the Circuit Court for the District of Indiana said:

"The latter I think the true reading, and it means that at any time before or after maturity of the note by its terms, or by the terms of any agreement for renewal or extension, the holder, whether the payee or any assignee, may, by agreement with the maker, or with an indorser or other party liable on the paper, renew or extend the date of payment 'from time to time,' that is to say, definitely, without prejudice ultimately to his remedies against any of the parties.    Every successive taker of the paper is, of course, bound to take notice of this stipulation, and, instead of looking only to the face of the instrument for the time of its maturity, as in case of commercial paper he must, is put upon inquiry whether or not any agreement for a renewal or extension of time has been made by his proposed assignor or by any previous holder.  *  *  *  The note in suit, it seems clear enough, cannot be deemed negotiable."

In Union Stockyards National Bank v. Bolan, 14 Idaho, 87, 93 Pac. 508, 125 Am. St. Rep. 146, the provision in the note is as follows:

"No extension of time of payment, with or without our knowledge, by the receipt of interest or otherwise, shall release us or either of us from the obligation of payment."

The court said:

"This is an express contract to the effect that the time of payment may be extended to any one or all of the sureties, guarantors, indorsers, or makers of the note, without notice to all or any one of them.    This undoubtedly renders the note non-negotiable under all the authorities that have been brought to our attention on the subject."

In Rossville State Bank v. Heslet, 84 Kan. 315, 113 Pac. 1052, 33 L. R. A. (N. S.) 738, the provision of the note was that:

"Each signer and indorser makes the other an agent to extend the time of this note."

The court refers to the former case in that state of Bank v. Gunter, 67 Kan. 227, 72 Pac. 842, in which the provision appeared in the note that:

First Nat'l Bank of Albuquerque v. Stover, 21 N. M. 453.

"The makers and indorsers  *  *  *  agree to all exten-
sions and partial payments before or after maturity with-
out prejudice to holder."

In discussing the case under consideration, and the
Gunter Case, the court said:

"Interpreting 'signer' to mean 'maker,' and the agency of
each maker and indorser to act for the other, as equivalent
to a consent to the action of either to an agreement for ex-
tension made by another, the only material difference dis-
cernible is that in the Gunter Case the note stated that the
extension might be made before or after maturity, while in
this case it authorizes the extension without stating when it
may be made. The precise inquiry suggested is whether the
authority to extend here given may be exercised only after
maturity. If so, the time is fixed for payment; for the prom-
ise, apart from this clause, is to pay on January 1, 1909, and
an authority to extend afterwards would only amount to a
waiver of the right to be relieved from liability for an ex-
tension without such authority. If, however, the clause is to
be construed as giving the parties named the right to ex-
tend the time before maturity, its effect would be precisely
the same as though the words 'on or before' had been in-
serted, and the rule of the Gunter Case would apply. * * *
The vice of the stipulation in question is that the day of
payment cannot be determined. The signer (maker) or any
indorser may, at any time he sees fit to do so, as agent one
for another, extend the time for payment by agreement with
the holder. The payee in transferring the note may become
an indorser, and therefore an agent for the maker, and his
indorsee may, in turn, become an indorser with like power,
so that the time of maturity must be indefinite, and not de-
terminable from the instrument."

See further many cases collected in a note to First Na-
tional Bank v. Buttery, 17 Ann. Cas. 52.

It clearly appears from the reading of the foregoing
cases, and many others which we have examined, that in
the opinion of those courts the uncertainty as to the time
of payment, which is held to render the note non-negotia-
ble, arises out of the fact that there is an agreement in
the note that the same may be extended prior to maturity.
The fact that such extension of the time of payment is
contemplated and provided for is held to render the time
of payment so uncertain as to destroy the negotiability of
the instrument. On the other hand, there is a line of
cases, mostly more modern, which takes an opposite view
of provisions of this kind. They are based upon the pro-

position that the time of payment within the meaning and requirement of the law merchant and the negotiable instrument law is certain or determinable, whenever the time at which the payee or holder may demand payment is certain or determinable. We have before seen that, under the terms of this instrument, in this case, the payee or holder is entitled to demand payment on the day specified therein, there being no right on the part of any other party to the instrument to compel him to extend the same against his consent. The Texas case, heretofore cited and quoted from, is one of the leading cases adopting the latter position. The North Dakota case is another leading case to the same effect. In Missouri-Lincoln Trust Co. v. Long, the Supreme Court of Oklahoma announces its adherence to the same doctrine that so long as the payee or holder may insist upon the payment of the note at maturity, there is no uncertainty as to the time of payment, citing the Texas case, supra, and Missouri cases. In Longmont National Bank v. Loukonen, supra, the makers and indorsers agreed to any extensions of time of payment before, at, or after maturity. The Colorado court in that case adopts the reasoning of the Texas and North Dakota courts, and says:

"The time of payment of this note, by its express terms, is certain. A definite time when the holder may demand payment is stated, and the period of maturity is fixed. There is nothing in the note which gives the maker, or any one else, a right to demand an extension, or which binds the holder to give it. We are unable to perceive how the mere fact that the signers and indorsers undertake to be bound by any extension of time of payment, which may thereafter be settled upon, takes from an instrument in all other respects commercial paper, its negotiable character. Any agreement for an extension, not appearing in the instrument, and unknown to a purchaser for value before maturity, would not defeat his right to demand payment of the note according to its original terms. * * * The sole purpose of the stipulation is for the protection of the holder, by continuing the liability of both maker and indorser in case of extension. * * * A legal right exists in the maker and holder of any negotiable instrument to agree to an extension, and the fact that such legal right exists does not make the paper non-negotiable; no more should the fact that the maker's consent to an extension, which he always has the legal right to give, is

expressed in the note, but which does not in fact constitute an extension, have such effect. To hold that an undisclosed agreement to extend destroys the obligation to pay a note according to its terms, thus making the time of payment uncertain, in the hands of a bona fide holder for value before maturity, would be contrary to every principle of justice and fair dealing. Such would be the effect of declaring this instrument non-negotiable."

The court cites the Missouri, North Dakota, Texas, and Oklahoma cases, before referred to.

In City National Bank v. Goodloe-McClelland Co., 93 Mo. App. 123, the note provided that:

"The makers and indorsers agree to all extensions and partial payments before or after maturity without prejudice to the holder."

The court held that this provision did not impair the negotiability of the note.

We propose to adopt what, we are free to admit, is the minority doctrine, at least so far as numbers of states are concerned, because we believe the doctrine to be founded in reason, and to be the best suited to business and commercial usage. It is a matter of common knowledge that it is the general, if not the universal, custom of banks to insert provisions of a similar nature to the ones inserted in the note in question, whenever they loan money. We cannot see that harm can come to the people of the business world by holding this note to be a negotiable instrument. On the other hand, we can see that harm may come from unduly hampering business transactions of this kind. If a banker must insist upon payment of a note at maturity or otherwise lose the security of indorsers upon commercial paper, then the borrowers of money from banks will inevitably suffer great inconvenience, and often great loss. This is apparent to all who have had experience or observation in commercial transactions of this kind. Nor will this holding operate as a restraint upon the dealing in commercial paper for the reason that under sections 52 and 56 of our negotiable instruments law (chapter 83, Laws of 1907) the assignee cannot take such paper and lose the benefit of its negotiable character unless he

has actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounts to bad faith. A simple inquiry in good faith of the payee or holder of negotiable paper as to whether the same had been extended by the parties thereto would, we assume, be held to constitute such assignee a holder in due course. It follows that the judgment of the district court in holding that the instrument was non-negotiable was erroneous.

It is urged by counsel for appellant that this court should now enter judgment for the plaintiff upon the note in question. It appears, however, from the pleadings that the question of taking of the note by the plaintiff in good faith or bad faith was in issue, but was not decided by the court, the court having directed a verdict for the defendant upon the sole proposition that the note was non-negotiable, and that therefore there was no question as to the good faith or bad faith of the plaintiff, in taking the note, for determination by the jury. It is argued, on the other hand, by counsel for appellee, that the action of the court in directing a verdict for the defendant was a finding that the burden of proof resting upon the plaintiff in regard to good faith in the taking of the note had not been met. We think not. The district court, at the instance of counsel for the defendant, held that the note was non-negotiable, and that therefore it was subject, in the hands of plaintiff, to all of the defenses set up in the answer. The plaintiff, of course, denied the allegations in the answer that it had taken the note in bad faith, and introduced proof on the issue. But this issue has never been submitted to a jury, nor decided by the court. It is therefore apparent that the cause must be retried.

For the reasons stated, the judgment of the court below is reversed, and the cause remanded to the district court, with instructions to award a new trial; and it is so ordered.

ROBERTS, C. J., and HANNA, J., concur.

## ON REHEARING.

PARKER, J.—[**3**]   In the last section of the opinion we determine that the question as to whether the plaintiff took the note without notice, and in good faith, had not been determined in the court below, and consequently we remanded the cause for a new trial.   A later examination of the record, however, discloses that in this we were in error, and for that reason we have granted a rehearing.

At the close of the case each party moved for an instructed verdict in his favor, the defendant specially submitting the case on the "basis of all evidence."   This necessarily submitted to the court the evidence on the question of notice and good or bad faith on the part of the appellant in taking the note.   The appellant does not resist this proposition, but, on the contrary, insists that the evidence submitted authorizes and requires a judgment in its favor.   Appellee, of course, argues that the evidence authorized the direction of a verdict in favor of appellee upon this point, and that the action of the court cannot be disturbed here.   There is a controversy between counsel as to the issue tendered by the answer.   It was alleged in the answer that:

"The said plaintiff had full knowledge and notice of all of the facts hereinabove stated, and took the said note charged and chargeable with full knowledge and notice thereof, and of each of said facts."

In the reply the appellant denied this allegation of the answer, and alleged that it acquired said note for full value in due course of business prior to its maturity, and without knowledge of any defect or want of consideration or other defects claimed by said defendant.   Upon this state of the pleadings the appellant argues that there was tendered the sole issue of notice or want of notice to the appellant of the infirmities in the paper, and that no issue of bad faith in taking the note was tendered by the pleadings.   The appellee contends that the allegations of the answer are broad enough to tender the issue both of actual notice and of knowledge of such facts that the taking of the instrument amounted to bad faith.   In view of

the disposition which we will make of the matter, we do not deem it necessary to determine specifically whether the issue tendered was narrowed by the pleadings, as claimed by the appellant, or not, and the case will be treated as if the pleadings tendered both issues.

One M. W. Flournoy, vice-president and manager of the appellant bank, was the only witness who testified upon these subjects. He flatly denied that he or the appellant bank had any knowledge or notice of the defects or infirmities of the paper at the time the bank took the same; the business having been done entirely between the holder of the note and the witness as such vice-president and general manager.     Upon cross-examination the witness was not shaken in any particular from the position which he took on direct examination in this regard.     The issue then as to whether the appellant bank had notice of the infirmities of the paper at the time it acquired it may be dismissed from further consideration, there being no evidence of any kind in the record to support a finding that it did have such notice, and, on the other hand, evidence given all showing that it did not have such notice.

Upon cross-examination the witness Flournoy was pressed for facts which might show that he was aware of the financial condition of the payee, and the general condition of his business affairs, from which it was thought to be inferred that the note was taken in bad faith.     He was asked whether he did not know, prior to taking the note, that the Montezuma Trust Company, of which the payee of the note was the head, was in bad financial condition, and that the payee was endeavoring to reorganize the same with additional capital.     The witness admitted that he knew that the Montezuma Trust Company was doing business under unfavorable conditions; that he had declined to join in the reorganization of the same, and supposed that the plan had been abandoned.     He testified that the Montezuma Trust Company appeared to be in financial difficulty.     He further testified that the payee presented the note, and asked a loan of $5,000 with the note as collateral security, which was made, and the proceeds placed

to the credit of the Montezuma Trust Company according to the custom of years; the payee not having a personal account with the appellant bank. The note was upon a printed blank, with the Montezuma Trust Company named as payee, and it was interlined, substituting the name of the payee for that of the Montezuma Trust Company. The note was payable on or before two years from date, and the witness testified it was not customary for the appellant bank to discount such note, but it was customary to take the same as collateral. The note provided for semi-annual interest, but the witness did not demand interest for about one year after the date of the note. He explained the failure to demand the interest by saying that, the note being held as collateral security, the bank did not attend to the collection of the interest promptly, as it would in case the bank really owned the note. The witness said he understood the maker of the note to be a man of means, and knew nothing about his business affairs, or whether he had needs to raise money on notes, and made no inquiry of the payee as to how he came to have the maker's note. This is the substance of the testimony of the witness Flournoy, on this subject on cross-examination. The most that can be said for this evidence is that the bank failed to make inquiry of the payee how or why he came to have such a note of the maker. That the bank did not take the note in bad faith in the sense that it knew of these infirmities, and attempted to defraud the maker to its advantage, or that of the payee, is apparent. The evidence points to no other conclusion. The bank simply failed to inquire of the payee how or why he had such a note, either through negligence, or carelessness, if, indeed, it was its duty to so inquire, or under suspicious circumstances.

Appellee argues that while gross negligence is not the same thing as bad faith, it may be evidence of the same and, in this case the appellant bank having been negligent, or being aware of suspicious circumstances, these facts are sufficient to support a finding of bad faith in taking the note. He relies upon Goodman v. Harvey, 4 Adolphus & Ellis, 870; Ward v. City Trust Co., 192 N. Y.

61, 84 N. E. 585; McNight v. Parsons, 136 Iowa, 390, 113 N. W. 858, 22 L. R. A. (N. S.) 718, 125 Am. St. Rep. 1265, 15 Ann. Cas. 665; Re Hopper-Morgan Co. (D. C.) 156 Fed. 525; and 1 Daniel on Negotiable Instruments (6th ed.) § 776.

In Goodman v. Harvey, supra, the bill was given by the defendants to a shipowner for freight. It was presented for acceptance by an agent of the holder, and acceptance was refused, and the bill was protested. The bill was then returned to the payee, and was again put out by him, and was discounted by the plaintiff. When it became due, it was presented to the makers, and payment refused, and it was thereupon again protested for non-payment. The jury, in answer to a question from the Lord Chief Justice, said that in their opinion the notarial marks on the bill were sufficient notice to an indorsee of non-acceptance. The court said:

"The question I offered to submit to the jury was whether the plaintiff had been guilty of gross negligence or not. I believe we are all of opinion that gross negligence only would not be a sufficient answer where the party has given consideration for the bill. Gross negligence may be evidence of mala fides, but it is not the same thing. We have shaken off the last remnant of the contrary doctrine. Where the bill has passed to the plaintiff without any proof of bad faith in him, there is no objection to his title. The evidence in this case as to the notarial marks could only weigh as rendering it less likely that the bill should have been taken in perfect good faith."

In Willis v. Bank of England, 4 Adolphus & Ellis, 32, it is said:

"A doctrine has, indeed, prevailed that the person taking a negotiable instrument must show that he used such caution as a prudent man acquainted with business would exert; but this gave rise to many complicated questions, and the law has now nearly reverted to the old rule, which was that of certainty and convenience, that the bona fide holder of a negotiable instrument for value is entitled as against every one. It would probably be considered now, if the precise point arose, that the real question was bona fides. * * * It would, perhaps, be more correct to say that the same facts might raise the presumption of gross negligence or that of fraud. The facts might show a determination to wink at anything."

First Nat'l Bank of Albuquerque v. Stover, 21 N. M. 453.

In Ward v. City Trust Co., supra, the trust company had representatives on the board of directors of a corporation, and two of the officers of the corporation used the funds of the corporation for the payment to the trust company of their personal obligations to it. The transaction was on its face apparently without authority on the part of the officers of the bank. The court said:

"It was not enough for the trust company to part with value by surrendering the note and collateral, for it was bound to act in good faith in order to get good title. * * * Bad faith in taking commercial paper does not necessarily involve furtive motives; for it exists when the purchaser has notice of facts which, if unexplained, would show that he was taking the property of one who, to quote again from Paviour Case, 'owed him nothing, in payment of a claim that he held against some one else. * * * Even if his .actual good faith is not questioned, if the facts known to him should have led him to inquiry, and by inquiry he would have discovered the real situation, in a commercial sense he acted in bad faith, and the law will withhold from him the protection that it would otherwise extend.' "

The court said further:

"The presumption was against the transaction, and, as we have seen, unless the presumption was overcome by reasonable inquiry, the transaction, unlawful in fact and unlawful on its face, is presumed to have been known to the trust company to be unlawful."

In McNight v. Parsons, the note was delivered by the maker to the payee under agreement that it should not be negotiated until it was ascertained whether a certain fact came to pass, and in case it did not, the note was to be void and to be returned to the defendant. The question was whether the holder and plaintiff was a holder in good faith. It appears that the plaintiff in that case was really a dummy, and the note was indorsed to him for the express purpose of avoiding such defenses as the defendant might make against the holder of the note. The plaintiff made no attempt to assert the good faith of his purchase, or to negative the fact that he had notice of any defense thereto. The trial court directed a verdict for the plaintiff upon the ground that there was no evidence of bad

faith in the taking of the note. The judgment was reversed. It is said by the court:

"It is equally true that, if the facts shown have any fair tendency to show bad faith, the question remains one of fact, and not of law. It is especially the case where the evidence of fraud is sufficient to put the burden of showing good faith on the holder."

In re Hopper-Morgan Co., supra, it appeared from an agreed statement of facts that the plaintiff purchased the note in a peculiar way, under peculiar circumstances, and with knowledge that the note had been issued for some particular purpose, not disclosed, but that Mugler, who had disposed of it to Prescott, from whom the claimant obtained it, was not the owner, and had the right to use it as collateral merely. The court said:

"If the purchaser of the note has actual knowledge of the infirmity in the note, or want of title in the one from whom he takes it, that, of course, ends the case. If he has no such actual knowledge, then bad faith or a willful disregard of known facts showing the infirmity or want of title or a willful evasion of knowledge of the facts, will be sufficient to defeat recovery. Facts sufficient to create a suspicion of the truth are not sufficient to show knowledge or bad faith, nor is mere gross negligence in making inquiry, or in failing to make inquiry, alone, sufficient. There must be either actual knowledge or bad faith. Bad faith may be shown by a willful disregard of and refusal to learn the facts when available and at hand."

It is apparent from what has been shown as to the facts in each of the foregoing cases that they have no application to a case like the one under consideration. In each of those cases, except, perhaps, the English cases, there was something about the nature of the transaction itself which excluded and prevented any dealing concerning the same in good faith. In the case at bar there was nothing whatever about the nature of the transaction which called for explanation; it bore no evidence whatever of illegality or fraud, but was the usual and ordinary commercial transaction. Mr. Daniel, in discussing this proposition, uses the following language:

"It thus appears that the majority rule, referred to in the

foregoing discussion, that there must have been actual no-
tice or bad faith, has been codified in those states which
have enacted the statute. According to that rule, and under
the statute, mere suspicion of defect of title or knowledge
of circumstances which would excite suspicion in the mind
of a prudent man, or even gross negligence on the part of
the taker of the instrument, at the time of transfer, will not
defeat his title. While neither gross negligence, nor knowl-
edge of suspicious circumstances, of itself constitutes bad
faith as matter of law, it is evidence from which bad faith
may be inferred, and such facts, when proven, may be con-
sidered by a jury in arriving at the ultimate fact of good or
bad faith. What constitutes this actual knowledge of bad
faith, under the statute, has been the subject of judicial dis-
cussion. Bad faith in taking commercial paper, it has been
said, does not necessarily involve furtive motives. It may
be shown by a willful disregard and refusal to learn the
facts when available and at hand, and if a purchaser of a
note for value before maturity has notice of facts tending
to show defenses to the same, he cannot purposely refrain
from making inquiries as to the inception of the paper, and
at the same time claim to be a bona fide purchaser." I
Daniel, Nego. Ins. (6th Ed.) § 776.

Appellant cites a multitude of cases upon the general
doctrine that there must be either actual notice, or bad
faith to defeat a holder of commercial paper. A few of
them only will be cited. Murray v. Lardner, 2 Wall. 121,
17 L. Ed. 857; Swift v. Tyson, 16 Pet. 1, 10 L. Ed. 865;
Goodman v. Simonds, 20 How. 343, 15 L. Ed. 934; Bank
v. Neal, 22 How. 96. 16 L. Ed. 323; Cromwell v. County
of Sac, 96 U. S. 58, 24 L. Ed. 681; Shaw v. Railroad Co.,
101 U. S. 564, 25 L. Ed. 892; Swift v. Smith, 102 U. S.
442, 26 L. Ed. 193; Second National Bank v. Morgan,
165 Pa. 199, 30 Atl. 957, 44 Am. St. Rep. 653; Cheever
v. Pittsburg, etc., R. R. Co., 150 N. Y. 65, 44 N. E. 701,
34 L. R. A. 69, 55 Am. St. Rep. 649; Kitchen v. Louden-
back, 48 Ohio St. 177, 26 N. E. 979, 29 Am. St. Rep.
544; Jennings v. Todd, 118 Mo. 303, 24 S. W. 148, 40
Am. St. Rep. 377; Wilson v. Denton, 82 Tex. 531, 18 S.
W. 620, 27 Am. St. Rep. 912; Breckenridge v. Lewis, 84
Me. 349, 24 Atl. 864, 30 Am. St. Rep. 357; Youle v.
Fosha. 76 Kan. 20, 90 Pac. 1091; Eames v. Crosier, 101
Cal. 260, 35 Pac. 873; Matlock v. Scheurman, 51 Or. 49,
93 Pac. 826, 17 L. R. A. (N. S.) 747; McPherrin v. Title
36 Okl. 510, 129 Pac. 722, 44 L. R. A. (N. S.) 395;

Scandinavian, etc., Bank v. Johnston, 63 Wash. 187, 115 Pac. 102; Reilly v. McKinnon, 159 Fed. 78, 86 C. C. A. 268. He also cites 7 Cyc. 945, and Crawford's Am. Neg. Ins. Law (3d ed.) 68. These authorities all establish the uniform doctrine that a holder of commercial paper may be a holder in due course, notwithstanding that he may have knowledge of suspicious circumstances, or may be guilty of even gross negligence in taking the paper; the question always being in such cases whether he took the paper in good faith or bad faith.

It is apparent, however, from what has been heretofore seen in the original opinion and herein, that this fundamental, underlying proposition is not quite the proposition involved in this case. The question in this case is whether there was sufficient evidence before the trial court to authorize a finding that the plaintiff bank took the note in bad faith. In other words, the question is, Had the trial court or the jury made a specific finding that the plaintiff bank did not take the note in good faith, is there any substantial evidence in the record upon which such a finding could be based? We do not think that there is any such evidence. As has been before pointed out, this transaction was the ordinary business transaction dealing with commercial paper. There was nothing about the note itself to call attention of the plaintiff bank to any infirmity in the same. There was nothing about the circumstances or the relations of the parties which called for explanation on the part of the payee, or which even was calculated to arouse suspicion on the part of the bank. The witness Flournoy testified that he treated the transaction exactly as he would treat any other of the same character, and that he knew nothing irregular or defective about the note. Owing to the condition of the record, we are put in the position of sitting as a jury or a trial court, and passing upon these facts. After careful examination of the testimony, and a thorough consideration of all legitimate inferences which could be drawn therefrom, we are compelled to say that there is no substantial evidence in the record authorizing a finding of bad faith on

the part of the bank. A fine discussion of this same question is to be found in 3 R. C. L., p. 1071, § 277, et seq. It is there said:

"It is a general principle, running through all branches and subjects of the law, that one will be charged with notice of a fact who has information which should have put him upon inquiry, if, by following up such information with diligence and understanding, the truth could have been ascertained. * * * It is now well settled, however, that the doctrine of notice, as it affects good faith of transactions generally, does not apply to negotiable instruments."

Detroit National Bank v. Union Trust Co., 145 Mich. 656, 108 N. W. 1092, 116 Am. St. Rep. 319, is cited, wherein it is said:

"It is a general rule, applicable to transactions not involving commercial paper, that where one has notice of facts which would put an ordinarily prudent man upon inquiry, he cannot be considered a bona fide purchaser, if he neglect to take such care of his own interests as an ordinarily prudent man would do, but that rule has not been applied to commercial paper."

A lengthy quotation from Jones v. Gordon, L. R. 2 App. Cas. 627, is inserted in the opinion, from which we quote the following:

"But if the facts and circumstances are such that the jury, or whoever has to try the question, came to the conclusion that he was not honestly blundering or careless, but that he must have had a suspicion that there was something wrong, and that he refrained from asking questions, not because he was an honest blunderer or a stupid man, but because he thought in his own secret mind, 'I suspect there is something wrong. and if I ask questions and make further inquiry, it will no longer be my suspecting it, but my knowing it, and then I shall not be able to recover,' I think that is dishonesty. I think, my lords, that this is so not only by good sense and reason, but by the authority of the cases themselves."

In section 278 of 3 R. C. L., p. 1074, it is said:

"He cannot be charged with notice by reason of any want of diligence on his part, even when he is in the situation where such facts could be ascertained by inquiry. * * * Gross negligence even is not sufficient; actual knowledge of the facts which impeach the validity of the note must be

brought home to the holder. Knowledge, however, may be shown to have been possessed by the party either by direct proof, or by facts and circumstances that fairly lead to that conclusion, and circumstances that are not of any great probative force in themselves are admissible in connection with other proof to show guilty knowledge or want of good faith."

In section 280, p. 1075, R. C. L., it is said:

"Although suspicious circumstances are not notice as a matter of law, yet the jury may find them to be so as a matter of fact, and evidence going to show the existence of such grounds for suspicion is always admissible."

See, also, Harrington v. Butte, etc., Mining Co., 33 Mont. 330, 83 Pac. 467, 114 Am. St. Rep. 821.

The only suspicious circumstances, if it may be called such, is the fact that this note was dated January 5, 1911, and was negotiated by the payee on January 6, 1912. It appears in the record that this note was made on January 5, 1912, and was accidentally misdated. However, at the time the note was negotiated, the fact that the payee had apparently had possession of the note for a year was not mentioned. It might be argued that a man who had a good note like the one in question, and who needed money, would hardly refrain from using it for a year after its date, and that the bank should have taken notice of this fact, under the circumstances. On the other hand, if the matter was considered at all by the bank, which does not appear from the record, it might well have been inferred that the negotiating of the note one year after its date was in accordance with a perfectly honest and lawful arrangement with the maker. No inference of bad faith can be legitimately drawn from this circumstance. The question is, Did the witness, Flournoy, as the agent of the bank, know or believe at the time he took the note from the payee that it was being fraudulently put out by him, and did he willfully refrain from inquiry along that line? We have been unable, after a careful re-examination of the testimony, to put finger upon any fact from which a legitimate inference could be drawn to that effect.

This being the state of the record, we find that there is no substantial evidence upon which the district court

could have found that the appellant bank took the note in bad faith. There being no such evidence, it was error to so find, and for that reason the judgment will be reversed. As a matter of fact the record bears internal evidence, but not in direct terms, that the trial court did not so find, but, owing to the form in which the record is presented here, he is made to have so found, as already pointed out.

The judgment of the lower court will be reversed and the cause will be remanded to the district court, with directions to enter judgment in favor of the appellant bank as prayed in the complaint; and it is so ordered.

ROBERTS, C. J., and HANNA, J., concur.

## ON SECOND MOTION FOR REHEARING.

PARKER, J.—[4] A second motion for rehearing has been filed and is allowable, we assume, for the reason that the question to which it is directed was first considered upon the first motion for rehearing. The motion is directed to a supposed departure in the holding of the court from rules fixed by statute and the previous holdings of this court. The motion calls attention to sections 649 and 653, Code 1915, being a part of the Negotiable Instrument Act, and suggests that the court overlooked those provisions. Section 649 provides that the title of a person who negotiates an instrument is defective "when he negotiates it in breach of faith, or under such circumstances as amount to fraud." Section 653 provides that:

"When it is shown that the title of any person who has negotiated the instrument was defective, the burden is on the holder to prove that he or some person under whom he claims acquired the title as holder in due course."

Section 646, Code 1915, defines a holder in due course as follows:

"A holder in due course is a holder who has taken the instrument under the following conditions: * * * III. That he took it in good faith and for value; IV. That at the time

it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it.''

It sufficiently appears, from what has been heretofore said in the two opinions heretofore handed down in this case, that the title of the payee of this note was defective, and that the plaintiff bank took the paper charged with the burden of establishing that it took the same in due course; that is to say, under the facts in this case, that it took it in good faith and for value, and without notice of any infirmity in the instrument or defect in the title of the person negotiating it. While neither of these sections of the statute were noticed in the opinion, none of the principles or rules therein mentioned were overlooked by the court. In the discussion of the matter, the exact situation herein outlined was assumed.

The question, then, before the court is whether that burden of proof resting upon the plaintiff bank has been successfully met by the proofs. In our former discussion of the evidence, we pointed out that there was no evidence in the case tending directly to show notice or lack of good faith on the part of the bank when it took the paper. We further pointed out that there was no evidence in the case from which any legitimate inference of notice or lack of good faith could be drawn. The evidence was all one way, and pointed unequivocally to lack of notice and to good faith on the part of the plaintiff bank.

Counsel for appellee, however, points out the fact that one of the important considerations before the trial court was the demeanor and character of the witness Flournoy, whose conduct and honesty in taking the paper for the bank were directly involved. The verdict of the jury was in the following form:

"We, the jury, by direction of the court, find the issues in this cause for the defendant."

The answer interposed by the defendant below tendered the proposition that the plaintiff bank—

First Nat'l Bank of Albuquerque v. Stover, 21 N. M. 453.

"had full knowledge and notice of all the facts, * * * and took the said note charged and chargeable with full knowledge and notice thereof and of each of said facts."

The reply put this allegation in issue. When the jury returned the verdict, by direction of the court, finding the issues for the defendant, it consequently found this issue as to notice against the plaintiff bank. Counsel for appellee would have the court hold, if we understand the motion, that because the character and demeanor of the witness Flournoy was one of the considerations before the court and jury, therefore there is substantial evidence in the case to support the finding of the issue of notice to the bank, as found by the jury. They say in their motion that:

"His testimony alone, especially under the circumstances surrounding the transaction, was insufficient to compel the court, as a matter of law, to find the fact in accordance with his evidence."

We appreciate fully the great difference in the effect of the evidence of a witness when he appears before a trial court, where he is seen and heard, where his demeanor while testifying may be observed, and the sum total of his credibility may be ascertained, and its effect when reduced to writing and submitted to an appellate court. Untruthful witnesses seldom escape discovery, especially where their evidence is submitted to a trained man for consideration. It nevertheless remains true that this personality, demeanor while testifying, and apparent carefulness and fairness on the stand is something which cannot be committed to paper, and which is not present before a reviewing court. Here we must judge of the witness' testimony by what he is reported to have said, without the aid of this personal element in his testimony. Here in the examination of the testimony of the witness, if he stands unimpeached, either by direct evidence of his lack of veracity, or of his bad moral character, or if unimpeached by some equivocal character of his testimony or inherent improbability therein, or by some other legal method of impeachment, we must assume that his evidence is true.

To hold otherwise would bring us to absurd results. For example, can it be said that a finding by a trial court, or a verdict found by direction of the court against a plaintiff, where all of the evidence in the case is in his favor, and, where there is none against him, cannot be disturbed in this court, because, possibly, the court did not believe the witnesses for the plaintiff, and consequently refused him the relief which he sought? Such cannot be the law. If there was a single fact in this record pointing to bad faith, or knowledge on the part of the bank, or if there were equivocation or inherent improbability in the testimony of the witness Flournoy, or if he had been impeached in some way, we might say that the court correctly found the issue as to the notice and good faith against the plaintiff bank, because he did not believe the witness Flournoy, the one witness who testified on the subject. There being no such infirmities in the testimony, there is no foundation upon which to base a finding of knowledge or bad faith on the part of the bank.

Counsel in the motion suggest that the court in its holding has departed from the established doctrine in this jurisdiction that a verdict of a jury or the finding of the trial court will not be disturbed in this court if it is supported by any substantial evidence. This has been the established doctrine of this court ever since the case of Candelaria v. Miera, 13 N. M. 360, 84 Pac. 1020, and we do not desire to depart from or modify the doctrine there stated. But, as we have pointed out in this case, there is no substantial evidence, and no legitimate inferences can be drawn from any of the evidence, to support the finding of the court and the jury under his direction that the bank had notice of the infirmities in this paper or took it in bad faith.

For the reasons stated, the motion for rehearing will be denied; and it is so ordered.

ROBERTS. C. J., and HANNA, J., concur.