101 P.2d 398

MEDLER v. HENRY.

No. 4504.

Supreme Court of New Mexico.

April 12, 1940.

Barnes & Corey and Marron & Wood, all of Albuquerque, for appellant.

W. A. Keleher and Theo. E. Jones, both of Albuquerque, for appellee.

BRYAN G. JOHNSON, District Judge.

Appellee, as special administratrix of the estate of Sophie Osterloh, deceased, filed suit in the nature of replevin, against Catherine M. Henry, the appellant. Appellee was thereafter appointed executrix under the last will and testament of said Sophie Osterloh, deceased, and as such executrix was substituted as party plaintiff.

In her complaint appellee alleged that Sophie Osterloh died May 18, 1938, the owner of certain personal property; that appellant had possession of said personal property, and had refused to deliver possession of such personal property to appellee. The value of the personal property was alleged to be $22,000. Appellee waived immediate delivery of the property but prayed for possession of the property or damages. By her answer appellant denied that Sophie Osterloh owned the property in dispute at the time of her death, and by way of new matter appellant claimed ownership of said property by gift from Sophie Osterloh on May 13, 1938.

The case was tried before a jury with Honorable Thomas J. Mabry presiding as judge. The jury found the issues in favor of appellee and judgment was entered upon the verdict in favor of appellee for the possession of the personal property involved.

The principal contention made by appellant is that the trial court erred in not directing a verdict for the appellant at the close of the case. Counsel for appellant takes the position that appellant had established the fact of a gift by uncontradicted and unimpeached testimony, and that it was therefore the duty of the trial court to direct a verdict in her favor. Counsel for appellant moved for a directed verdict at the conclusion of the case; after the adverse verdict, counsel for appellant moved for judgment non obstante veredicto and then by a motion for a new trial again raised the same question. These motions were all denied by the trial judge.

We must now determine whether or not the evidence in this case presented a jury question on the issue of gift or no gift.

A brief sketch of the circumstances leading up to the alleged gift, as disclosed by the evidence, follows:

Sophie Osterloh at the time of her death on May 18, 1938, was seventy-eight years of age. She was a native of Germany, but had lived in Albuquerque, New Mexico, for over forty years and had worked as a cateress until she fractured her hip about five years before her death. She never married. During her residence in Albuquerque she lived with Christine Lundin, who had been her close friend for forty years. Christine Lundin was an elderly woman, and apparently somewhat crippled. During the later years of Sophie Osterloh's life these two old ladies lived in rooms on the second floor of an old business building in the business district of Albuquerque. Their living quarters were meagerly furnished and their method of living was simple and frugal. Sophie Osterloh's ma-

terial wealth was largely represented by securities which she kept in tin boxes in her home. These boxes she carried with her to the hospital in a bag, and from the hospital to the home of Mrs. Kottman when she was removed there shortly before her death. She had no near relatives. There were several women in Albuquerque with whom she was on varying terms of intimacy and friendship, and included in this list of friends were Mrs. Delia Kottman and the appellant, Mrs. Catherine Henry. Mrs. Kottman had been acquainted with her for many years; Mrs. Henry's acquaintance dated back to 1936. Both Mrs. Kottman and Mrs. Henry had been attentive to Miss Osterloh in the last months of her life.

In the fall of 1937 Sophie Osterloh had been informed by her physician that she was suffering from an incurable malady; that it was his professional opinion she had but a few months to live, and should go to a hospital where she would receive proper attention. She was reluctant to go to an institution but finally did consent to be taken to a hospital in March, 1938. Miss Osterloh had expressed a dislike for wills, but nevertheless she called C. M. Botts, an attorney, to come to the hospital to draw her will about May 5, 1938. She instructed her attorney to prepare her will with the following provisions: To Mrs. Sarah Goodrich, $1,000; to appellant, Mrs. Catherine Henry, $1,000; to Christine Lundin, $1,000; to Pablo Apodaca, $500; to Margaret Medler, the residuary estate. She then decided on changes in her will. The

will, as finally executed on May 6, 1938, provided as follows, in so far as changes were made in the original draft: To Catherine Henry, $500; to Christine Lundin, $500; to Pablo Apodaca, nothing; to Sarah Goodrich, the residuary estate. The will named Margaret Medler as executrix and expressly recited that it was the desire of testatrix that none of the heirs of testatrix should share in her estate.

Miss Osterloh was not satisfied to remain in the hospital. She insisted on leaving against the advice of her physician. At first she planned to return to her own rooms, but finally went to the home of Mrs. Delia Kottman. She was removed from the hospital to the Kottman home by ambulance on Thursday, May 12, 1938. On the following day, Friday, May 13th, the alleged gift took place between 5:00 and 6:00 o'clock in the evening. Five witnesses testified as to the gift. These witnesses were the appellant Catherine Henry, Mrs. Delia Kottman, Fred L. Kottman, husband of Mrs. Delia Kottman, Thomas Cadle and his wife, Mary Cadle.

Appellant related the events as follows:

"Q. Tell the jury in your own way all that took place after the Kottmans came in? Tell them all that you can remember now? A. After the Kottmans came in we were sitting there talking and we were talking about a party, a little birthday party that she had been to at the Cadle's home, and she asked Mr. Kottman how he was, and she said, 'I suppose you are tired.' And in the meantime while we were all

there she said, 'Mrs. Henry, get my big white box,' which I did. It was in the wardrobe, opposite her bed; she said 'Get me my keys out of my pocket book,' which I did; she said—

"Q. Where were they? A. In her pocket book in the dresser drawer. She said, 'Unlock it,' and I did. After I unlocked it she opened it and she put her hand in this big box and took out a little small—

"Mr. Wood: The witness refers to Exhibit F in speaking of 'this big box.' A. Yes, and she took out a little tin box and she said, 'Mrs. Henry, I am giving you this box, and what is in it is a gift; you have been a loyal friend to me; keep it, it is yours.' I took the box over and laid it on the dresser. I opened the box and I said, 'Look what she has given me.' I opened the box and took out the papers and looked at them before all the folks in the room; after I did that I put them back in the box again and I left the box on the dresser; she called me back over to her bed, and she said, 'Mrs. Henry'—She had me lock the box, which I did, and she handed me the big white box, and she said, 'I am also giving you this box, and what is in it, but I want you to give it to Christinie,' which she called Christine, 'she has been good to me, and you be good to her.' That is what she said to me.

"Q. You looked at the things you say were in the box, the small box? A. I did.

"Q. And that is the box which I show you, Plaintiff's Exhibit B? A. That is the box.

"Q. And you looked at what was in it? A. I did.

"Q. Now, after you say you placed it on the dresser while she called you back to give you this box, Exhibit F, what did you next do; what was next done with the box, Exhibit B? A. I opened it and looked at it again and I put them in my suitcase under the bed which I had in Sophia's room.

"Q. And thereafter what did you do with this box? A. I left it there in my suitcase in her room until after her death."

The other four witnesses testified similarly to appellant as to the making of the gifts to Mrs. Henry and Christine Lundin, without material deviation. There was no contradiction by the testimony of any witness as to the making of the gifts. In fact, there was no one who could have disputed the testimony of these five witnesses for the reason that the five of them all stated that no one was present except Sophie Osterloh and the five witnesses.

Counsel for appellant urges upon us the proposition that since the gift was positively testified to by five witnesses, at least three of whom were disinterested, the trial court was duty bound to direct a verdict for appellant, in the absence of any testimony contradicting or impeaching the five witnesses.

Whether or not uncontradicted testimony can be disregarded by the trier of facts has

frequently been the subject of discussion by courts of last resort. It is a question which has already received consideration by this court.

In First National Bank of Albuquerque v. Stover, 21 N.M. 453, 155 P. 905, 915, L.R. A.1916D, 1280, Ann.Cas.1918B, 145, the question of lack of notice of infirmities and of good faith on the part of the plaintiff bank in purchasing a note was in issue. The only testimony on the point was that of M. W. Flournoy, an officer of the bank. Parker, J., stated on the second motion for rehearing: "Counsel for appellee would have the court hold, if we understand the motion, that because the character and demeanor of the witness Flournoy was one of the considerations before the court and jury, therefore there is substantial evidence in the case to support the finding of the issue of notice to the bank, as found by the jury. They say in their motion that: 'His testimony alone, especially under the circumstances surrounding the transaction, was insufficient to compel the court, as a matter of law, to find the fact in accordance with his evidence.' We appreciate fully the great difference in the effect of the evidence of a witness when he appears before a trial court, where he is seen and heard, where his demeanor while testifying may be observed, and the sum total of his credibility may be ascertained, and its effect when reduced to writing and submitted to an appellate court. Untruthful witnesses seldom escape discovery, especially where their evidence is submitted to a trained man for consideration. It nevertheless remains true that this personality, demeanor while testifying, and apparent carefulness and fairness on the stand is something which cannot be committed to paper, and which is not present before a reviewing court. Here we must judge of the witness' testimony by what he is reported to have said, without the aid of this personal element in his testimony. Here in the examination of the testimony of the witness, if he stands unimpeached, either by direct evidence of his lack of veracity, or of his bad moral character, or if unimpeached by some equivocal character of his testimony or inherent improbability therein, or by some other legal method of impeachment, we must assume that his evidence is true. To hold otherwise would bring us to absurd results. For example, can it be said that a finding by a trial court, or a verdict found by direction of the court against a plaintiff, where all of the evidence in the case is in his favor, and where there is none against him, cannot be disturbed in this court, because, possibly, the court did not believe the witnesses for the plaintiff, and consequently refused him the relief which he sought? Such cannot be the law. If there was a single fact in this record pointing to bad faith, or knowledge on the part of the bank, or if there were equivocation or inherent improbability in the testimony of the witness Flournoy, or if he had been impeached in some way, we might say that the court correctly found the issue as to the notice and good faith against the plaintiff bank, because he did not believe the witness Flournoy, the one witness who testified on

the subject. There being no such infirmities in the testimony, there is no foundation upon which to base a finding of knowledge or bad faith on the part of the bank."

In Gebby v. Carrillo, 25 N.M. 120, 177 P. 894, 896, this Court again had under consideration the question of the good faith of the plaintiff holder of a note. The only testimony concerning the purchase of the note by plaintiff was given by plaintiff. In reviewing the authorities this Court stated:

"Many courts hold that a denial of notice by the purchaser, though he be uncontradicted by any other witness, is not sufficient to justify a directed verdict in his favor or the setting aside of a verdict against him. The mere fact that the witness is interested in the result of the suit is sufficient to require the credibility of the witness to be submitted to a jury as a question of fact, and that either a court or a jury is at liberty to disbelieve his testimony solely on the ground that he is interested." Citing New York cases and decisions from many other jurisdictions. "Some courts even go further, and hold that, even as to facts testified to by disinterested witnesses not contradicted, the party is entitled to have the jury pass upon such facts, and that the truth of the evidence is for the jury to determine." Citing Missouri and Massachusetts cases.

"The opposing rule is possibly best stated by the Court of Appeals of New York in the case of Hull v. Littauer, et al., 162 N. Y. 569, 57 N.E. 102, as follows:

" 'Generally, the credibility of a witness who is a party to the action, and therefore interested in its result, is for the jury; but this rule, being founded in reason, is not an absolute and inflexible one. If the evidence is possible of contradiction in the circumstances, if its truthfulness, or accuracy, is open to a reasonable doubt upon the facts of the case, and the interest of the witness furnishes a proper ground for hesitating to accept his statements, it is a necessary and just rule that the jury should pass upon it. Where, however, the evidence of a party to the action is not contradicted by direct evidence, nor by any legitimate inferences from the evidence, and it is not opposed to the probabilities, nor, in its nature, surprising or suspicious, there is no reason for denying to it conclusiveness. Though a party to an action has been enabled, since the legislation of 1857 (chapter 353, Laws of 1857), to testify as a witness, his evidence is not to be regarded as that of a disinterested person, and whether it should be accepted without question depends upon the situation as developed by the facts and circumstances and the attitude of his adversary.' "

In referring to the rule stated in Hull v. Littauer, et al., supra, this court then said: "Many later cases in New York and some of the other states follow these two cases, and give them the effect of holding that the testimony of an interested witness cannot be repudiated by the jury as untrue without good reason." Citing cases.

After thus reviewing the apparent conflict in the authorities, this court concluded:

"This court in the case of [First Nat.] Bank v. Stover, 21 N.M. 453, 155 P. 905, L.R.A.1916D, 1280, Ann.Cas.1918B, 145, followed the rule announced by the New York Court of Appeals in the case of Hull v. Littauer, supra. Whether we were right in that opinion is immaterial to a decision in this case; for, even if the rule in the case of Hull v. Littauer, supra, and that line of cases, be accepted as correct, the testimony given by the appellant is possible of contradiction in the circumstances and its truthfulness and accuracy were open to a reasonable doubt upon the facts in the case."

Again in Morrill v. Jones, 26 N.M. 32, 188 P. 1108, 1109, this court had before it a case involving the testimony of an interested party as to good faith purchase of a note. This case was decided on the authority of Gebby v. Carrillo, supra, this court stating: "This case is controlled by the case of Gebby v. Carrillo [25 N.M. 120], 177 P. 894. The burden was upon the appellant to establish to the satisfaction of the jury that the bank was a bona fide purchaser of the note, and the only evidence given upon this question was that by Markley and Haston, officers of the bank who made the purchase. They were interested parties, and whether their evidence sufficiently satisfied the burden resting upon the bank, and made good its claim to be an innocent purchaser, was for the jury, unless the evidence was such that no fairminded person could draw any other inference therefrom. This was the rule announced in the case of Gebby v. Carrillo,

supra. The evidence here was not of that character."

The case of Martinez v. Floersheim Mercantile Company, 27 N.M. 245, 199 P. 905, 906, involved the question of fact as to whether or not the transfer of certain property to appellant by her husband was made to cheat and defraud the appellee. Appellant and other witnesses (presumably disinterested) testified without direct contradictory evidence. This court there said:

"We have carefully read the record, and find that, although there is no evidence to contradict specifically the testimony of the appellant and her witnesses that the transaction was as she testified, nevertheless the court was at liberty to disregard her testimony and that of her witnesses, and to believe that the whole transaction, because of the suspicious circumstances attending it, was fraudulent.

"In Gebby v. Carrillo, 25 N.M. 120, at page 128, 177 P. 894, at page 897, the whole subject is reviewed, and the rule applicable to this case is laid down in the following quotation:

" 'The testimony given by the appellant is possible of contradiction in the circumstances and its truthfulness and accuracy were open to a reasonable doubt upon the facts in the case.'

"In the present case there were suspicious circumstances and inherent probabilities which justified the court in his view of the case and furnished the substantial evidence which is the basis of his judgment."

In Walker v. Smith, 39 N.M. 148, 42 P.2d 768, 769, reference is made to First Bank v. Stover, supra, and Gebby v. Carrillo, supra. This court there stated: "It is true that the evidence relied upon by appellant is not contradicted by the testimony of any other witness, but it contained such elements of weakness on the cross-examination and otherwise that we are not able to say that the court was in error in refusing to hold that it supported such requested finding."

Many cases from other jurisdictions are collected in Gebby v. Carrillo, supra. The later cases involving the question here under consideration will be found in Kelly v. Jones, 290 Ill. 375, 125 N.E. 334, 8 A.L.R. 796 and, Jerke v. Delmont State Bank, 54 S.D. 446, 223 N.W. 585, 72 A.L.R. 27.

The annotator in 8 A.L.R. makes this general observation at page 797: "All agree that the jury must not believe impossibilities. Beyond this there is no rule generally applicable. As applied to uncontradicted testimony there are two broad rules: one, that the uncontradicted testimony of a witness is for the jury; the other, that the jury may not arbitrarily reject the uncontradicted testimony of a witness; and the courts apply one or the other as they mean to leave the matter to the jury, or to interfere. In the statement of these two rules the courts sometimes give preference to the power of the jury, and sometimes, on the other hand, require the jury to accept uncontradicted testimony unless there is some apparent reason against it. Cases in this annotation, as will be seen, are grouped generally according to the result, not according to the phrasing of the rule in the particular case. Sometimes the two rules are given in combined or double form. In a few jurisdictions an attempt has been made to enforce a rigid rule, at least so far as appellate courts are concerned, that the jury is not bound to believe uncontradicted testimony."

From the annotations in 8 A.L.R. and 72 A.L.R., and from the cases cited in Gebby v. Carrillo, supra, it is seen that the cases announce two different broad rules, and that even the same jurisdiction (New York, for example) frequently follows one of these broad rules in one situation and the other broad rule in another situation.

We discover, however, no inconsistency in the decisions of this jurisdiction.

From the New Mexico cases discussed, we believe the rule in this jurisdiction to be that the testimony of a witness, whether interested or disinterested, cannot arbitrarily be disregarded by the trier of the facts; but it cannot be said that the trier of facts has acted arbitrarily in disregarding such testimony, although not directly contradicted, whenever any of the following matters appear from the record:

(a) That the witness is impeached by direct evidence of his lack of veracity or of his bad moral character, or by some other legal method of impeachment.

(b) That the testimony is equivocal or contains inherent improbabilities.

(c) That there are suspicious circumstances surrounding the transaction testified to.

(d) That legitimate inferences may be drawn from the facts and circumstances of the case that contradict or cast reasonable doubt upon the truth or accuracy of the oral testimony.

We now examine the record in this case in the light of the above rule.

We must not lose sight of the fact that *two* gifts are involved, one to appellant and the other to Christine Lundin; and, that the testimony of all five witnesses was positive and direct as to the making of both gifts at the same time. The making of the two alleged gifts constituted one transaction. If legitimate inferences can be drawn from the evidence that the testimony as to the gift to Christine Lundin was fabricated, then the jury could reasonably conclude that the whole story was false. The record contains a number of facts and circumstances from which the jury could reasonably infer that no gift was ever made to Christine Lundin by Sophie Osterloh.

The five witnesses testified that the two gifts were made between five and six o'clock on Friday, May 13, 1938. About 2 P. M. on that same day, Christine Lundin visited for some time with Sophie Osterloh at the Kottman home, but Sophie Osterloh made no mention of making a gift to Christine. The jury could, as reasonable men, consider this silence on the part of Sophie Osterloh as a very suspicious circumstance. Within three hours after her visit with Christine, an intimate friend and companion for forty years, Sophie Osterloh makes a very substantial gift to her through the medium of a third party. Why did she not make the gift direct to Christine at two or two thirty o'clock instead of making an indirect gift between five and six o'clock? Why did she not at least mention to Christine that she intended to make the gift? Considering the close relationship between Christine and Miss Osterloh, the silence of the alleged donor was a circumstance that the jury may well have regarded as decidedly suspicious.

None of the five witnesses ever told Christine about the generous gift that had been made to her. It is perhaps not strange that nothing was said between the date of the gift and Sophie Osterloh's death five days later. The disinterested witnesses may have considered that it would have been a breach of confidence for them to have disclosed to anyone prior to Sophie Osterloh's death what had taken place at her bedside. But, after Sophie Osterloh died, it was clearly the duty of each and every one of them to see that the wishes of Sophie Osterloh were carried out, not only as to the gift to appellant, but as to the gift to Christine Lundin as well. But not one of them saw fit to advise Christine Lundin of her good fortune. The record indicates that Christine never heard of the alleged gift to herself until the witnesses told their story on the witness stand. Surely the jury could not be considered unreasonable in viewing the silence of these five witnesses as very strange and suspicious conduct—conduct that cast rea-

sonable doubt upon the truth of their story that a gift had ever been made to Christine Lundin.

The conduct of appellant, Catherine Henry, must now be considered. Appellant testified that immediately after the death of Sophie Osterloh, she took the boxes and their contents to her attorney, R. P. Barnes, and told him all about the *two* gifts. But Judge Barnes never told Christine Lundin that he had taken into his possession a box, the contents of which belonged to her as a gift from Sophie Osterloh. As a matter of fact, Judge Barnes' conduct clearly indicated that he knew nothing of any. gift to Christine. Appellee, as special administratrix, immediately after Sophie Osterloh's death was demanding possession of the boxes and their contents. On May 21st, Judge Barnes gave appellee a document listing the securities claimed by appellant. This document reads as follows:

"List of Articles in Small Tin Box:

"The contents of this box were selected by Sophie Osterloh shortly before her death, in the presence of witnesses, and were delivered to Catherine M. Henry as an outright gift with words that showed that donor made such gift in contemplation of death. Because of this, Mrs. Henry lists the contents of the box, but refuses to deliver the same to anyone and claims title and ownership thereto: (Here follows detailed list of securities)

"The above instruments are in my possession this 21st day of May, 1938, and I agree to be responsible for their produc-

tion, if required. (Signed) R. P. Barnes, Atty. for Mrs. Henry."

On the same day Judge Barnes *delivered possession* of another box and all its contents to the special administratrix, although this box and contents had allegedly been given to Christine Lundin, and was her property. At the time of delivery of these articles Judge Barnes submitted a document to the special administratrix bearing this title: "List of articles left in the possession of Mrs. Catherine M. Henry by Sophie Osterloh at the time of her death on May 18, 1938."

This document begins as follows: "A large tin bread box with Yale lock and key (the key delivered to Mrs. Henry by Mrs. Osterloh) contents as follows: * * *"

After the listing of the contents of the box, the document concludes with these words: "Albuquerque, N. M. 5–21–38. Received items set forth in the preceeding pages numbered 1–2–3–4–5–6. (Signed) Margaret Medler, Special Administratrix for Estate of Sophie Osterloh."

The form of the receipt made up by Judge Barnes, the fact that he delivered the box and contents to the representative of the estate, the fact that Judge Barnes made no mention of any gift to Christine Lundin, are circumstances that give rise to a strong inference that Judge Barnes never had heard of any alleged gift to Christine Lundin. It was the duty of Judge Barnes to inform Christine of the gift if he knew about it. Surely the jury could reasonably infer that Mrs. Henry never told Judge

Barnes about the gift to Christine; and such failure to disclose the fact of this gift to her lawyer *when it was part and parcel of the transaction under which she claimed her own gift* was a circumstance in the case that cast doubt upon the whole story about the gifts. Would not any reasonable man consider it a strange and unusual thing for Mrs. Henry to relate to her lawyer only half the story about the gifts, telling only about her own gift and saying not one word about the gift to Christine Lundin? Would not the jury be justified in inferring that all five witnesses went over the facts of the case with appellant's attorney, R. P. Barnes, long before the day of trial? Would the jury not be justified in doubting the whole story because of Judge Barnes' continued silence? Judge Barnes has been a highly respected member of the bar for fifty years. This court is unwilling to believe that he would turn over to the estate of Sophie Osterloh property rightfully belonging to Christine Lundin, or remain silent when he discovered the true facts; and, the jury may well have considered these circumstances strange and suspicious so far as any gift to Christine was concerned. The conduct of all five witnesses and of Judge Barnes gives rise to legitimate inferences that contradict and cast doubt upon the testimony of a gift to Christine.

Another phase of appellant's conduct should be referred to. After the alleged gifts on May 13th, and prior to Sophie Osterloh's death on May 18th, Mrs. Henry went to her attorney, Judge Barnes, for the purpose of being appointed the guardian of Sophie Osterloh's person and property. A petition was prepared by Judge Barnes and signed and sworn to by Mrs. Henry on May 17th but was never filed in court. This petition alleged the incompetency of Miss Osterloh and contained this allegation: " * * * that at the request of the incompetent, Petitioner has the possession and charge of incompetent's Bank Book and of other property, documents and papers by the incompetent committed to the care of Petitioner. * * *"

The gifts were supposed to have taken place on May 13th. The contents of the box that was Christine's gift *included the bank books,* yet on May 17th appellant swears the bank book was the property of Sophie Osterloh and had been "committed to the care of" appellant. We cannot say that the jury would be arbitrary or unreasonable if it considered this conduct of appellant as directly contradictory to the testimony about a gift to Christine. Also the petition infers that considerable property *of Sophie Osterloh's* had been intrusted to the care of appellant, yet if the gifts actually took place on May 13th there was practically nothing of value left on May 17th, in either appellant's or Sophie's physical possession that legally belonged to Sophie. This conduct of appellant (and of the witness Delia Kottman, who participated in the effort to get a guardian), justifies the inference that no gifts whatever had been made.

The nature of the gifts themselves could reasonably be considered a suspicious cir-

cumstance. The alleged gift made to appellant consisted of securities in a small tin box. These were apparently all first class securities, and consisted of postal savings certificates, full paid income shares of Albuquerque Federal Savings and Loan Association, and several notes. The face value of these securities was $19,450, and there was testimony that their fair value was $16,000. On the other hand, the contents of the box intended as a gift for Christine contained a great variety of things. The securities in this box consisted of promissory notes and one real estate contract. The notes and contract had a face value of about $24,000; their actual value was testified to as about $7,-800, exclusive of the real estate contract, which had a face value of $1,350. As to the respective values of the two gifts, it appears that appellant, a friend of . two years standing, and of middle age, received $16,000 worth of property, whereas Christine Lundin, an elderly lame woman, and a friend and room-mate for forty years, got half that amount. Furthermore, there were a lot of articles in the box intended for Christine that were odd subject matters for a gift, for example: ten abstracts of title, a salary assignment, an attorney's receipt for various documents, dishonored checks, bank books, tax redemption certificate, releases of trust deeds, special masters' deeds, cancelled checks, letters, quitclaim deeds, warranty deeds, transcript of a judgment, key to Sophie Osterloh's room, and "one bundle of miscellaneous letters and other documents."

We could not say that the jury was acting arbitrarily if it viewed this situation with grave misgivings as to the truthfulness of the testimony of all five witnesses. Here was a gift to appellant of apparently carefully selected securities, and at the same time a sort of "catch-all" gift to Christine. A reasonable inference could be drawn from the nature of the two gifts that would cast doubt upon the testimony.

We heretofore set out the main provisions of Sophie Osterloh's will executed by her on May 6th. One week later it is claimed she gave away most of her estate to two people who received but modest bequests in her will. We, ourselves, do not attach much significance to this phase of the evidence, but we cannot say that the members of the jury would be acting unreasonably or arbitrarily if they considered the will as a circumstance casting serious doubt upon the testimony of the alleged gifts.

From the evidence just reviewed we conclude that the trial court committed no error in submitting the case to the jury. There were facts and circumstances in evidence that cast reasonable doubt upon the testimony of the five witnesses. There were facts and circumstances in evidence that justified legitimate inferences directly contradictory to the facts testified to by the witnesses.

Counsel for appellant also assigns as error the refusal of the trial court to give appellant's requested instruction Number 2: "That mere opportunity and inclination

of a person to take or convert property belonging to another is not sufficient evidence that they did so take and convert."

The jury was fully instructed by the trial court as to the issue and as to the essential elements of a valid gift. Assuming that requested instruction Number 2 was a correct statement of law, still the trial court was not in error in refusing to give the instruction. In the form submitted by counsel for appellant the requested instruction gave undue prominence to an isolated fact and the trial court properly refused the instruction. In 14 R.C.L. p. 780, Sec. 48, it is stated: "It is a dangerous practice to call special attention to an isolated fact and thus, by making it prominent, lead the jury to the opinion that it is of greater significance and weight than other unmentioned facts in the case which may be of no less importance, for the jury will feel bound to regard the fact, thus isolated for their consideration, as the controlling if not the only important fact in the cause which should govern them in making up their verdict. Therefore it is a general rule that an instruction should not single out particular facts and thereby give undue prominence to them, as such practice tends to mislead the jury."

Appellant's third ground for reversal is that: "Excessive and improper cross examination was indulged by the court and counsel, incited prejudice and passion upon the jury, and the court erred in refusing new trial upon that ground."

The trial judge examined the witness Mrs. Delia Kottman and the appellant at considerable length and probably with some vigor as to certain features of their testimony. But we cannot give consideration to the question of whether or not the character of the court's questions was prejudicial. Counsel for appellant raised the question for the first time in the motion for new trial. No exceptions were taken during the trial. No complaint was made to the trial judge that his manner and method of questioning appellant's witnesses were prejudicial in order that he might correct the alleged error. Appellant did not move for a mistrial which was a protection open to appellant if her counsel believed that irreparable damage had been done. He who knowingly bets on a lame horse has no just cause for complaint if his steed finishes out of the money on three legs. Appellant gambled on the outcome of the case and her counsel in effect admit this when they say "confronted with this situation, and believing that we would have a right to an instructed verdict and thus save our client from the danger, we did not make more objection than appears in the record." After the adverse verdict it was too late for appellant to claim error predicated on questions asked or remarks made by the court. Territory v. McGrath, 16 N.M. 202, 114 P. 364; State v. Kidd, 24 N.M. 572, 175 P. 772.

Appellant urges as error the refusal of the trial court to grant a new trial because of "excessive and improper" cross examination on the part of counsel for ap-

pellee. The principal complaint of counsel for appellant is not that the court permitted improper cross examination, but that counsel for appellee attempted it. The attempts by counsel for appellee to cross examine witnesses on collateral issues were frequently thwarted by the trial court upon objection by counsel for appellant, and in some instances the court voluntarily instructed the jury to disregard the questions. The manner in which a trial judge deals with attempts of counsel to pursue forbidden lines of cross examination is not subject to review unless a clear abuse of discretion is revealed by the record. This is the rule even where such cross examination on collateral matters is permitted by the trial court: "However, the exact extent to which this cross examination may go rests almost entirely in the discretion of the trial court, since from the nature of the case no fixed rule could be devised defining the right and limiting the extent of irrelevant inquiry which would be just or safe in universal application. This must be determined by the relation and apparent character and bearing of the witness under examination, and the circumstances attending the particular cause on trial, and an appellate court will not interfere with the exercise of discretion by the trial court unless a clear abuse thereof is made to appear." 28 R.C.L., Sec. 198, p. 609.

We find no abuse of discretion on the part of the trial court in the matters complained of.

Finding no error in the record, the judgment of the trial court should be affirmed, and it is so ordered.

BICKLEY, C. J., and BRICE, ZINN, and SADLER, JJ., concur.