157 P.2d 243

DUNAKIN v. SOUTHWESTERN CONSUM-ERS CO–OP. ASS'N (BOWLES, Administrator, Office of Price Administration, Intervener).

No. 4867.

Supreme Court of New Mexico.

March 12, 1945.

Rehearing Denied April 12, 1945.

Rodey, Dickason & Sloan and Frank M. Mims, all of Albuquerque, for plaintiff-appellant.

F. L. Nohl and C. Roy Anderson, both of Albuquerque, for intervenor-appellant.

M. Ralph Brown, of Albuquerque, for appellee.

BICKLEY, Justice.

This is a suit for $50 plus a reasonable attorney's fee on account of an overcharge for a can of tomato juice, brought under the provisions of Sec. 205(e) of the Emergency Price Control Act of 1942, 50 U.S. C.A.Appendix § 925(e). After trial, but before judgment, the Administrator of the

Office of Price Administration intervened. From a judgment dismissing the complaint, the plaintiff and intervenor appeal.

The portion of Sec. 205(e) of the 1942 Act material to our consideration provides:

"If any person selling a commodity violates a regulation, order, or price schedule prescribing a maximum price or maximum prices, the person who buys such commodity for use or consumption other than in the course of trade or business may bring an action either for $50 or for treble the amount by which the consideration exceeded the applicable maximum price, whichever is the greater, plus reasonable attorney's fees and costs as determined by the court." 56 Stat. 33.

The district court made the following findings of fact and conclusions of law:

"I. That on or about November 26, 1943, the plaintiff purchased from the defendant at its store located at 2406 North Fourth Street in the City of Albuquerque, New Mexico, a 47 ounce can of Del Monte tomato juice.

"II. That at the time of the purchase the maximum price for said can of tomato juice, as established by the Office of Price Administration, was 28¢; that the price 57¢ was innocently marked by mistake by an employee of the defendant on the can itself, and at the time of the purchase the defendant charged and collected from the plaintiff innocently and through mistake, the said sum of 57¢.

"III. That a correct price list of articles was posted on the wall of the defendant's store in a conspicuous place, as required by the law, and it contained the correct ceiling price of this particular kind and size of tomato juice as 28¢.

"IV. That the plaintiff, at the time he purchased the said can of tomato juice, knew that the said price of 57¢ was over and above the maximum price for said can allowed by the Office of Price Administration, and that the plaintiff at said time, and with such knowledge, purchased the said can of tomato juice in bad faith, with the intent and for the purpose of laying a basis for this suit, in order to collect from the defendant the sum of $50.00, together with costs and attorney fees; that the said plaintiff did not purchase the said can of tomato juice in good faith for his use or consumption, but for the purpose of inducing the defendant to violate the law and regulations of the Office of Price Administration, so that he might benefit by suing the defendant for the $50.00 penalty provided by law."

"Conclusions of Law

"The Court concludes as a matter of law:

"I. The mistake or error of the defendant in selling the can of tomato juice at a price in excess of the ceiling price would not defeat a recovery by the plaintiff herein, but the mistake and innocence of the defendant in making the overcharge, coupled with the bad faith of the plaintiff,

who knowingly purchased the article at an excessive price, and who intentionally induced and assisted the defendant to violate the law so that the plaintiff might enrich himself to the detriment of the defendant, does defeat a recovery herein, and plaintiff's complaint should be dismissed at plaintiff's cost.

"II. The section of the Act under which this suit was filed was passed by Congress as a matter of public policy and for the benefit of the public welfare; and, incidently, it does penalize a violator and enrich the informer or prosecutor. That neither the public policy nor the public welfare would be protected nor promoted, nor the intention of Congress carried out by the rendering of judgment in favor of the plaintiff upon the facts of this case."

At the conclusion of the trial the court made the following statement which serves to illumine its formal findings and conclusions:

"The Court: There is no question in this case but what the can of tomato juice in question was sold by the Defendant to the Plaintiff for 57¢, and at the time the ceiling price under the OPA rulings, was 28¢. In the opinion of the Court, undoubtedly this price charge was entirely an innocent mistake, and there is nothing upon which the Court could find any wilfull violation. It appears, however, from authorities, that it is not necessary, under subsection E of Section 925 of this Emergency Price Control Act, as given in U.S.C.A.Appendix Vol. 50, that an intent is necessary;

that is, that an intent to violate is necessary, or that the violation should be wilful. However, this fact that it was apparently a mistake, I think, can be taken into consideration by the Court in connection with some other matters in the case. I take it, that in order to recover, the Plaintiff is required to prove by a preponderance of the evidence the essentials to show a violation. One of those essentials is that the purchaser who brings the action to recover the penalty of $50.00, bought the commodity for his use and consumption. All the evidence and the circumstances introduced in this case do not convince the Court that it was purchased for that purpose, and the Court is in considerable doubt as to whether that was the purpose. The very prompt and aggressive way that the plaintiff made his purchase and checked on it, and went to the OPA office, and hired a lawyer, all within a couple of hours or so, throws a great deal of doubt upon the good faith of the Plaintiff in this case, as to whether he bought it for the purpose of his own use and consumption, or whether he bought it for the purpose of bringing suit and collecting the penalty. The Court believes that the Plaintiff in this case, at the time he bought this merchandise, knew it was not properly priced. It was not a case where there was a cent or two, or a small fraction off, but it was double its ordinary price. It is shown that this Plaintiff had bought tomato juice many times before, and I believe at least a couple of months before this, had bought it, when he stated the price was about half what was charged

him at this time. He stated he thought it was a little out of line, but when he asked for the price and was told it was 57¢ he was satisfied that it was all right, but immediately it appears from the evidence, he went to a grocery store two blocks away, not for the purpose of buying, but for checking the price there, and then went on to the OPA office, and got his lawyer. The Court will dismiss the action on the ground that the Plaintiff hasn't proved the essentials to constitute a cause of action."

Thereafter occurred a colloquy between the court and counsel concerning several matters touching the case, during which the following appears:

"Mr. Anderson: (of counsel for Intervenor) It is simply our position that the sale of the commodity to the plaintiff, which as I understood has been established by the evidence, at a price above the Maximum price at the time of sale, if that sale was not in the course of trade or business, is a violation of the Emergency Price Control Act as amended, and the regulations thereunder.

"The Court: Any purchase is made in the course of business.

"Mr. Anderson: 'Course of trade or business.' That is the definition in the statute. It is our position in that connection, that the plaintiff, if it is established that the purchase was not made in the course of trade or business, is entitled to recover in an action of this kind, $50.00, attorneys fees and costs, if the sale was made at a price in excess of the ceiling price.

"The Court: Regardless of whether it was made for his use or consumption, or whether it was made to trap a merchant?

"Mr. Anderson: I think if the sale were made to trap a merchant there would be some question about it."

The plaintiff-appellant filed in the lower court assignments of error, and based thereon here urges the following points:

"1. The court erred in refusing to find that the plaintiff purchased the can of tomato juice in question for use or consumption other than in the course of trade or business.

"2. The court erred in finding that the plaintiff knew that the tomato juice was overpriced when he bought it.

"3. The court erred in finding that the plaintiff bought the tomato juice with the intent and for the purpose of bringing this suit.

"4. The court erred in giving judgment for the defendant."

The intervenor-appellant has filed his brief raising substantially the same points.

We must first consider whether court's finding No. 4 is sustained by substantial evidence. In so doing we are to be guided by the principles announced in Keil v. Wilson, 47 N.M. 43, 133 P.2d 705, 148 A.L.R. 397, to the effect that the Supreme Court resolves all disputed facts in

favor of appellee and views evidence in the aspect most favorable to him and that where a case is tried by Court without a jury, the trial court is sole judge of the credibility of witnesses and weight to be given to their testimony, and by the rules laid down in Medler v. Henry, 44 N.M. 275, 101 P.2d 398 where there is no direct testimony of other witnesses contradicting the testimony of the witnesses whose testimony is to be weighed and tested.

In addition to these tests we are required to look also to the nature of the fact material to be established. The mode of proving different essential facts is not always the same. One of the distinct classes of facts discussed by Wigmore is "State of Mind" which embraces intention, motive, purpose, etc. In his work on Evidence at Sec. 1965, Wigmore says:

"Testimony to one's own intention, or other state of mind, has often been attacked on the ground of what is really a disqualification by Interest; i.e. the argument is that, since a person's own intention can be known only to himself, his statement of what it is or was cannot be safeguarded by the possibility of exposing its falsity, through the aid either of conflicting circumstances or of opposing eyewitnesses; and that thus the influence of self-interest in falsifying is too dangerous, and that such testimony should consequently be forbidden. This argument has been generally repudiated."

Since the admissibility of such testimony is not here involved, we quote Wigmore merely for the background for the further rule that as to the weight to be given such testimony, caution should be exercised.

In 7 Enc. of Evidence at p. 598, after stating that a party may testify directly as to what his intention was in the given instance, the text writer proceeds to discuss the limitations of this rule, saying:

"Such direct testimony, however, is in no case conclusive, and is entitled to little or no weight when acts and declarations clearly indicate an intent contrary to that testified to."

That is merely to invoke the homely adage that actions may speak louder than words.

Appellant quotes Professor Wigmore in the 3rd Ed. of his work on the "Science of Judicial Proof" at pages 204, 205 as saying:

"It is assumed that somehow this kind of state of mind—impression, consciousness, knowledge, belief—is in the case, either as material to the issue or as relevant to prove something; and the question is how it is in its turn to be evidenced.

"Of the three kinds of evidence of a state of mind (ante, Sec. 84), the first two are here the commonest. (A) External circumstances, calculated by their presence or occurrence to bring about the state of mind in question, are available to show the probability that consciousness, knowledge, or belief subsequently ensued. (B) Conduct or behavior (including language not used assertively) illustrates and points back

to the state of mind producing it. (C) A prior or subsequent state of mind indicates, within certain limits, its existence at the time in question."

So, in the case at bar plaintiff was required to prove that the commodity was bought "for use or consumption other than in the course of trade or business." Upon plaintiff was the burden of proof. In Egling v. Lombardo, 1944, 181 Misc. 108, 43 N.Y.S.2d 358, 45 N.Y.S.2d 805, 807, it was said:

"As a measure to prevent or punish profiteering the Price Control Act is salutary legislation. The penalties imposed are by no means excessive as applied to the deliberate profiteer. But nothing in the content of the Act appears designed to suspend all processes of justice or to impair the concepts of ethics and morality. It neither states nor implies that one who has been sufficiently frugal to acquire a modest property is to be regarded with suspicion. It does not require that nobler motives be ascribed to one who seeks to recover the penalties imposed than to him upon whom they are imposed. It does not relieve the plaintiff of the burden of establishing his case by the fair preponderance of the credible evidence."

The plaintiff's own statement that he bought the commodity for his use or consumption is competent testimony. But the weight to be given to such testimony is to be determined by the trier of the facts in view of the surrounding facts and circumstances, and the court may consider the weaknesses that inhere in such testimony, pointed out by Wigmore, not as to its competency but as to its weight. There were some external facts also testified to by plaintiff which would tend to support his claimed state of mind: (a) He had been a user of tomato juice for many years and, (b) he did use it for ordinary consumption. Against the weight of plaintiff's own statement thus supported as to his purpose, the appellee lists the following facts and circumstances from the evidence:

"(a) The plaintiff is a well-educated business man with two years of college training.

"(b) The plaintiff had been drinking tomato juice some ten or twelve years, purchases being made about every two weeks, sometimes by him.

"(c) The plaintiff says that he thought the tomato juice was overpriced when he bought it. He also says it seemed too high, but he went ahead and bought it.

"(d) The tomato juice was purchased at double its regular price. It was not merely a few cents overpriced, such as might confuse an innocent purchaser, but was double the regular price.

"(e) The ceiling prices were posted in the store of the defendant.

"(f) The plaintiff had heard about OPA on the radio and necessarily was familiar with price ceilings from his business and purchasing experience.

"(g) The plaintiff was first very evasive as to the price he had paid for tomato juice on prior occasions. Then he admitted that he had bought tomato juice about two months previously and had paid 20¢ for a quart can. He says he knew about price ceilings, and then went to the absurd limit of saying he did not know that the price ceiling could not rise from 20¢ to 57¢ in two months.

"(h) Immediately following the purchase, the plaintiff went to Barber's Store a few blocks away. He says he went there to purchase meat, which he could have purchased at the store he left, and then seems to deny that he went to deal with Barber's.

"(i) The plaintiff checked the price of tomato juice at Barber's out of all the cans on the shelves. There were thousands of cans.

"(j) The plaintiff then went to OPA and to his lawyer the same day and on the same trip.

"(k) The defendant was innocent of any intent to overcharge (which is admitted on P. 2 of the plaintiff's Brief), the error being made by an incompetent clerk who had to be let go after working four or five weeks (P. 77)."

Since the asserted state of mind of the plaintiff is supported only by his own statements, the case is peculiarly one in which the verity of such statement is to be tested by all the circumstances of the case as well as by the demeanor of the witness which the trial court had an opportunity to observe.

A careful reading of the record puts some strain upon credulity in behalf of plaintiff. We are unable to say that the findings of the trial court are not supported by substantial evidence, or that the finding requested by appellants and refused by the court was so supported.

The next question is: Was the judgment supported by the findings and conclusions of the court? The answer to this question will incorporate a discussion of the materiality of such findings and conclusions.

That the Act is a necessary one in war time is not to be doubted. Among the express purposes of the Act are to, "Stabilize prices and to prevent speculative, unwarranted, and abnormal increases in prices * * *; to eliminate and prevent profiteering, hoarding, manipulation, speculation, * * * to prevent hardships to persons engaged in business." 50 U.S.C.A.Appendix § 901.

In the legal periodical "Law and Contemporary Problems", Vol. 9, 1942, p. 22 is an article entitled "The Emergency Price Control Act of 1942; Basic Authority and Sanctions" by Mr. David Ginsberg, law writer and General Counsel, Office of Price Administration. It is there said of Sec. 205(e):

"This provision has · caused some concern on the ground that it may be abused not only by irate and uninhibited con-

sumers and consumer groups, but by others less well intentioned. It is distinctly unpleasant in wartime to be hauled into court and charged with profiteering: a seller might well prefer to forestall the threat with a cash payment. To this criticism there are two answers. The first is that in the more blatant cases of abuse, the Administrator could intervene on behalf of the defendant and probably would. The second is that a wise public policy requires, when the stakes are so large and the task of enforcement may be so great, that the Administrator be allied with his most numerous beneficiaries, the consumers. Whether Section 205(e) will in fact ease the burden of enforcement very likely depends on the extent to which the country accepts price control as vital to the war effort. Only if it becomes a patriotic duty to comply with price ceilings, and unpatriotic to bootleg goods, will Section 205(e) be of any substantial value."

Subsequent experience has vindicated the fear that the Act might be abused by "uninhibited consumers and consumer groups, and *by others less well intentioned.*" (Emphasis supplied.)

If anything were needed to make certain what is meant by "consumers" we may turn to the message of the President, July 30, 1941, speaking of the results of inflation with its attendant hardships on the low and fixed income groups whose pay envelopes cannot keep pace with skyrocketing prices. President Roosevelt described the effects of inflation in these words:

"Great profits are reaped by some, while others with fixed and low incomes, find their living standards drastically reduced and their lifelong savings shrunken. The unskilled worker, the whitecollar worker, the farmer, the small businessman and small investor, all find that their dollar buys ever less and less."

We agree with the New Jersey Court quoted post, and the California Court in Peters v. Felber, post, and with the trial court, that while there was an intention to enlist the consumers in the enforcement of the Act, there is no discoverable intention to enlist those who are not its beneficiaries; namely, informers merely, who may be termed "unconscientious objectors".

In Peters v. Felber, Cal.Sup., 1944, 152 P.2d 42, 45, are given illustrations of attempts through a literal reading of the Act by successive purchases of commodities to run up enormous judgments against merchants and landlords. In the course of the opinion the court quoted as follows:

"There have been presented at the bar of this court, civil and criminal cases where the aggregate penalties sought to be recovered have amounted to enormous and well-nigh appalling sums by reason of plaintiffs permitting a long period to elapse before beginning actions. Actions of this nature have become highly speculative, and present a phase of litigation that ought not to be encouraged. The court is of opinion that, if cumulative recoveries are to be permitted, the Legislature should state its in-

tention in so many words; that a more definite form of statement be substituted for the words hitherto deemed sufficient."

The court also said:

"The danger of a construction which made a racket out of law enforcement, rather than a means to it, was seen as real, not just an argument without the validity of experience."

Judge Merrill E. Otis of the Federal District Court, Western District of Missouri, recently tried a case involving a similar sort of racket. See McCowen v. Dumont, D.C., 1944, 54 F.Supp. 749, 750. The court held that overcharge of rent amounting to a total of $39.50 in excess of the ceiling over a period of more than six months, during which 24 rent payments were made, authorized merely a judgment for $118.50 respectively for statutory damages and for attorney fees as against the contention that judgment should be for $1200, respectively, for statutory damages and for attorney fees. Judge Otis' astonishment is thus expressed:

"The suit (the complaint is in twenty-four counts) is for a total of $1,200 and an attorney's fee which the only testimony on the subject indicates also should be $1,-200. In other words, plaintiff would punish the widow, who is said to have overcharged plaintiff $39.50, by a judgment against her in the amount of $2,400. Mirable dictu!"

The last foregoing citations are merely for the purpose of showing the proper disposition of the courts to so con-strue the Act as to avoid absurd interpretation. They also lend support to the conclusion of the trial court that a plaintiff in order to maintain his action must show that he comes clearly within the provisions of the Act by being a purchaser of a commodity in good faith for his use or consumption. In other words, it was conceivable to the trial court that the language of the Act did not authorize the fostering of a racket even though not quite so bad as the ones attempted in the practices mentioned in the foregoing illustrations.

There has been quite a little written as to whether the provision of the statute, Sec. 205(e), is penal or remedial. It has been suggested that the only practical effect resulting from calling such an action penal is that penal actions must be brought into federal courts. It seems that the difference in viewpoint as to whether the provision is penal or not depends upon the question involved. For the purpose of interpretation and definition of the terms of the Act, Judge Otis thought that the statute must be regarded as penal. He said:

"The statute must be read as a whole. 50 U.S.C.A.Appendix § 901 et seq. Another part of the statute makes a selling of a commodity above the permissible price, if done 'wilfully,' a criminal offense. Section 925(b). Criminal statutes must be strictly construed. The criminal provision and the provision we are here considering have the same meaning as to what is the offense."

A somewhat similar conclusion was reached in Brown v. Cummins Distilleries Corp., D.C., 1944, 56 F.Supp. 941, 942, where the court said:

"Section 205 of the Act, dealing with enforcement provisions, provides in Subsection (e) that if any person subject to the Act violates a regulation or price schedule, the person who buys such commodity 'may bring an action either for $50 or for treble the amount by which the consideration exceeded the applicable maximum price, whichever is the greater, plus reasonable attorney's fees and costs as determined by the court.' It further provides that if 'the buyer is not entitled to bring suit or action under this subsection, the Administrator may bring such action under this subsection on behalf of the United States.' The recovery so provided is in its nature a penalty. 'A penalty is a sum of money of which the law exacts payment by way of punishment for the doing of some act that is prohibited, or omitting to do some act that is required to be done.' 25 Corpus Juris, Fines, Forfeitures and Penalties, § 72; In re Denver & R. G. W. R. Co., D.C. 27 F.Supp. 983, 984. It is essentially different from the idea of damages which is compensation to an injured party for the injury which he has suffered. In a proceeding of this nature the plaintiff has suffered no damages, and the action is not for the purpose of compensation. Regardless of the language in the statutory provision, it is the nature of the provision itself that is controlling. The action is essentially one for the recovery of a penalty."

See also Brown v. Glick Bros. Lumber Co., D.C., 52 F.Supp. 913 holding provisions penal as far as defendants are concerned.

■ We do not choose between a rule of strict or liberal construction. We think the Act should be reasonably construed and that its enforcement should proceed in a manner to accomplish the broad purposes of the Act.

The Act being new, there is not a large body of judicial decisions upon the exact point which was the basis of the trial court's ruling. There are, however, a few cases supporting the views of the trial court and no satisfactory authority has been produced asserting a contrary view.

In the case of Tropp v. Great Atlantic & Pacific Tea Co., 1943, 21 N.J.Misc. 205, 32 A.2d 717, 718, the court said of the controlling statute:

"This act was not created to make public informers of the general public. Viewed in a reasonable light it does not mean that every shopkeeper who makes an overcharge of even a few cents must forfeit $50 to every customer who decides to sue. To permit this interpretation would result in the clogging of all court processes. Persons should not be permitted to succeed under this act where their only motive is to enrich themselves at the expense of the man in business. To do so would violate one of the very purposes of the act which

is stated in the preamble 'to prevent hardships to persons engaged in business'. Chap. 26, Title I, Section 1, 56 Stat. 23, as amended October 2, 1942, Chap. 578, Section 7(a), 56 Stat. 767, 50 U.S.C.A.Appendix § 901. Unless the plaintiff can show that the commodity was purchased 'for use or consumption' there should be no recovery."

The foregoing language from the Tropp case was referred to with approval by the Federal District Court of the Eastern District of Pennsylvania in Everly v. Zepp, D. C., 1944, 57 F.Supp. 303, 305. That court also used the following language supporting the view that the courts no less than the consumers or an administrator of the Act are charged with the responsibility for a reasonable administration of the provisions of the statute. The court said:

"The Supreme Court has said that although the language of the act, Sec. 205 (a), [50 U.S.C.A.Appendix § 925(a)], appears to be mandatory some discretion must be allowed to the courts in construing it. They have been entrusted with a share of the responsibility in the war against inflation and their discretion in applying the remedies provided must be exercised in the light of the large objectives of the act. The standards of public interest and not the requirements of private litigation measure the propriety and need for the relief authorized. The Court favored the interpretation which affords full opportunity for courts to treat the proceedings under the act in accordance with their traditional practices as conditioned by the necessities of the public interest. Hecht Co. v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754."

In Jacobson v. Bowles, 1944, 53 F.Supp. 532, 533, it was decided that "An entrapment does not become a defense unless it is more than the ordinary testing of the citizen." This seems to imply that in some cases entrapment may be a defense.

In Egling v. Lombardo, supra, the court indulged a comparison of the situation of the parties plaintiff and defendant, saying:

"It should be noted here that the plaintiff appeared to be a well educated, keen, resourceful and well poised person. * * * On the other hand it was obvious that Mrs. Petrone and Mrs. Sofia were comparatively dull, poorly informed and lacking in perception and understanding."

In view of the admitted innocence of the defendant in the case at bar, the overpricing of the commodity having been inadvertently done by an inexperienced and incompetent clerk, in contrast with the actions of the well educated and astute plaintiff, we are not prepared to say that the trial court was in any way off the beam when he considered the innocence of the defendant in connection with the bad faith actions of the plaintiff in arriving at his conclusion. See Everly v. Zepp, supra. Some support is lent to the holdings in the Tropp and in the Everly cases by an observation of Mr. Robert A. Sprecher, writ-

ing on "Price Control in the Courts" in the January 1944 issue of Columbia Law Review at p. 61. He says:

"Only a buyer who buys 'for use or consumption other than in the course of trade or business' may bring an action under Section 205(e). A buyer who buys 'in the course of trade or business' is equally guilty with the seller under Section 4(a) of the Act, and being in pari delicto could not maintain a treble damage action even in the absence of the statutory limitation."

On the basis of this suggestion, since the buyer "in the course of trade or business" is not expressly authorized to bring an action and would by inference be precluded from doing so because of being in pari delicto, it is reasonable to suppose that the Congress, seeking to punish the seller of commodities in excess of ceiling prices did not intend to enlist the help of those who would be in pari delicto, such as informers, entrappers and those who sought to enrich themselves at the expense of those who violated the law either intentionally or unintentionally. In accordance with the expressions of the law writers heretofore quoted, it was thought that to enlist the help of consumers would be sufficient. To that end the Congress did not think it necessary to specifically exclude a buyer who buys "in the course of trade or business", and also a buyer who buys other than in the course of trade or business but not for use and consumption. The language of the provision was carefully chosen: "The person who buys such

commodity *for use or consumption* other than in the course of trade or business may bring an action, etc." (Emphasis supplied.) These words, creating a cause of action are words of exclusion as well as inclusion. Cf. Thurman v. Grimes, 35 N. M. 498, 1 P.2d 972, and Atchison, T. & S. F. R. Co. v. State Corporation Commission, 43 N.M. 503, 95 P.2d 676.

There is another matter which should be noticed. It has been conceded in the case at bar that the good faith and inadvertence of the violation of Sec. 205 (e) does not relieve the seller; still, as said in Everly v. Zepp, supra, this section must be construed in the light of the principles announced by the Supreme Court in Hecht Co. v. Bowles, 321 U.S. 321, 64 S.Ct. 578, 88 L.Ed. 754. The law on this subject was in a condition of some uncertainty when the 78th Congress, 2nd Session, 1944, by Sec. 108(b) of the Extension Act, approved June 30, 1944, effective July 1, 1944, 50 U.S.C.A.Appendix § 925(e), amended Sec. 205(e) by adding a proviso to the effect that the amount to which the overcharged consumer is entitled "shall be the amount of the overcharge or overcharges, or $25, whichever is greater if the defendant proves that the violation of the regulation, order or price schedule in question was neither willful nor the result of failure to take practical precautions against the occurrence of the violation." It may be said that this amendment, which reduces the amount which the overcharged consumer could recover if the defendant proves that his violation was not willful,

under the provisions of the 1942 Act sets at rest, at least so far as the intention of Congress is made manifest, that the lack of willfulness is not a complete defense but only cuts down the amount which the consumer may recover. It does serve, however, to show that Congress had taken cognizance of the injustice of repudiating the idea that the lack of willfulness was not to be considered as affording any measure of exoneration.

From all of the foregoing we conclude that the trial court committed no reversible error and that the judgment must be affirmed, and

It is so ordered.

SADLER, C. J., and MABRY, BRICE, and LUJAN, JJ., concur.